**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1297n.06

No. 12-3074

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Dec 19, 2012*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | C O U R T   F O R   T H E |
| v. | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| KAREN A. ANDERSON-BAGSHAW, | ) | |
| aka Karen Bagshaw, | ) | O P I N I O N |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:  MERRITT, MOORE, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  A jury convicted Appellant Karen Bagshaw of one count of mail fraud and thirteen counts of providing false statements to obtain federal employees' compensation.  She received disability payments while allegedly misrepresenting her physical abilities and her involvement in an alpaca farm.  To obtain evidence of her activities, the government installed a video camera on a utility pole overlooking Bagshaw's backyard.  Bagshaw appeals the district court's denial of her motion to suppress this footage at trial.  Bagshaw also appeals the district court's denial of her motion for a continuance, its exclusion of expert testimony, the alleged multiplicitous nature of her convictions, and the district court's denial of her motion for an acquittal based on the insufficiency of the evidence. We **AFFIRM**.

## I.  BACKGROUND

**Injury and Benefits**

In 1998, Karen Bagshaw was working as a mail carrier in Wickliffe, Ohio.  She began experiencing back pain and was diagnosed with thoracic degenerative disc disorder.  She received workers' compensation benefits beginning on May 25, 1998.  The next year, she underwent spinal fusion surgery.  The parties dispute whether the surgeon botched the surgery.  Regardless, Bagshaw did not completely recover and was later diagnosed with "failed back syndrome."

In the spring of 2000, Bagshaw returned to work for the USPS during the afternoons, performing limited duties such as answering the phone, completing paperwork, and delivering small packages.  Her primary care physician, Dr. Dicello, stated that she could work six hours per day, five days per week.  On June 19, 2002, the postmaster gave Bagshaw a new limited duty job offer for an early morning shift—5:30 a.m. to 11:30 a.m.  The postmaster consulted Bagshaw's current medical restrictions before making this offer, and they did not restrict the time of day she could work.  The new job did not involve duties any more strenuous than her current responsibilities.

Bagshaw accepted this job offer "under duress" but did not return to work.  She instead submitted an injury recurrence notice on August 9, 2002, indicating that her  medical condition had worsened on June 20—the day after she received the early morning shift job offer.  Her form stated that  Dr. Dicello said she could not perform sustained gainful employment due to her May 25, 1998 injury.  Bagshaw further stated that she was experiencing "[h]orrible constant pain" that "cause[d] [her] whole body distress."

The Department of Labor Office of Workers Compensation ("OWC") granted her total disability payments as of June, 2002. Between June 12, 2002, and July 2, 2011, the OWC paid Bagshaw approximately $291,000.

David Cattani, a Senior Claims Examiner with the OWC, explained the process by which federal civilian employees obtain disability benefits. Once removed from the payroll, the employee must file a form each pay period claiming wage loss. Eventually, if the injury is long-lasting, the employee will be placed on the "automated rolls" and will automatically receive payments. Once on the "automated rolls," the employee must complete an annual survey form called a CA-1032. This form asks about business involvement and any changes in the employee's life, including moving, household status, insurance settlements, etc. The amount of compensation a totally disabled employee receives is either 2/3 or 3/4 of his or her normal salary, depending on whether he or she is supporting dependents. An employee is entitled to these benefits until the OWC can prove otherwise.

On September 10, 2002, in response to a request from a claims examiner for more information about her injury recurrence, Bagshaw sent a letter to the OWC. She explained that she "stopped working mainly because they changed my job offer." Along with her letter, she submitted a letter of disability from an orthopedic surgeon, Dr. John Paul. Dr. Paul diagnosed her with, among other things, a "herniated thoracic disc, some problems with the fusion at the thoracic spine slightly higher up, [and] degenerative disk disease in the lumbar region." As a result, he stated that she was disabled and could not perform her duties at the post office. Bagshaw also included a form from Dr. Dicello stating that she was "permanently and totally disabled for any and all forms of sustained

gainful employment [and] . . . restricted to personal care and hygiene only due to the work injury of 5/25/[98]."

Bagshaw received several medical examinations from different physicians over the next several years. In 2004, at the request of the OWC, an independent physician named Dr. Ghanma examined Bagshaw and concluded she could return to work. Two years later a Dr. Metz disagreed and concluded she could not. In 2008, a third doctor, Dr. Rehmatullah, broke the tie and concluded that Bagshaw was "not medically capable of performing her duties as a letter carrier, since she ha[d] complaints of pain and utilization of opioid medication which would prevent her from performing satisfactorily in the workplace."

Between 2005 and 2009, Bagshaw annually received and returned CA-1032 forms by US mail. These forms required her to report things such as employment, self-employment, involvement in business enterprise, earnings, and volunteer activities for which compensation was received. Question 2 on the form asked, "Were you self-employed or involved in any business enterprise in the past 15 months?" Below the question it asked for a description of the work or business involvement. On her March 2007 form, Bagshaw answered "no" to the question and wrote "invest money in alpacas with husband for retirement later" in the description space. On her March 2008 form she answered "no." Her explanation was, "Invest in alpacas with husband, no return on money, though hopefully in future." On the March 2009 form she answered "yes." Her explanation was, "Don't earn income of any kind. Invest my money with my husband to buy feed for alpacas. I am married, so I am part owner."

Part B of the form asks, "During the past 15 months, did you perform any volunteer work for which ANY FORM of monetary or in-kind compensation was received?" Bagshaw never identified any such volunteer activity.

**Investigation**

In the summer of 2008, a claims examiner told Stephanie Morgano, Special Agent with the United States Postal Service Office of the Inspector General, that he was concerned Bagshaw was engaging in business activities in connection with an alpaca farm. Morgano learned the farm's name was K & J Alpacas and visited its website. She discovered that it advertised several things including alpacas for sale, transportation services, and Young Living Essential Oil ("YLEO") products.[1]

Continuing her investigation, Morgano attended an event hosted at the K & J Alpaca farm. She wore a wire and a camera and pretended to be interested in alpacas. Morgano conversed with Bagshaw, who repeatedly referred to the alpacas as an "investment." Bagshaw told Morgano that her husband performed the physical upkeep of the farm and distributed YLEO products, but Morgano observed Bagshaw raking up alpaca excrement.

Later that year, a Special Agent named Jeffrey Dancer, using an undercover name, contacted Bagshaw and scheduled a quality assurance review ("QAR") for December 10, 2008, in Cleveland. This covert interview was a common technique used to investigate possible workers' compensation

---

[1]According to Bagshaw, "YLEO is set up as a pyramid-scheme where customers buy a $40 'distributor kit' in order to obtain supposedly lower pricing and rebates in the form of 'commissions' for their own purchases and any distributors under them." It is similar to Amway.

fraud. The interview was recorded by two hidden cameras and monitored by three agents in an adjacent room.

During the QAR, Dancer asked Bagshaw many questions about her physical activities and business endeavors. Bagshaw described her pain as "consuming." She denied physically caring for the alpacas. She stated that her husband cared for the alpacas and ran the business. She said that she had not received any income from business or investment activities. She said she did not perform any volunteer work. She said she did no driving in connection with the alpacas. When asked whether she had left the state of Ohio in the past year, she said she went to Las Vegas in January. Finally, she said that she did not think she could work limited duty or limited hours.

At the end of the interview, Dancer helped Bagshaw fill out a 1032 form. Consistent with her responses on the previous forms she had sent in, she denied participating in volunteer activities for which she received compensation. In response to the question, "Were you self-employed or involved in any business enterprise in the past 15 months," she answered, "Yes, Investing in Alpaca's [sic] (only providing funding)." In the blank for "[d]escription of work or business involvement," she said, "Provide funding, no work activities, i.e. no bookeeping [sic], care, demonstrations, etc."

Following the QAR interview, agents began conducting visual surveillance to observe and record Bagshaw's physical activities. They followed her when she went on a Caribbean cruise, observing her activities at airports, the hotel, and aboard ship. They filmed her doing various things such as moving luggage, walking, sunbathing, and playing bingo. They attempted to catch her at two county fairs but were unsuccessful.

Conducting roadside visual surveillance at Bagshaw's home proved difficult. She lived in a "rather rural area," on a busy highway, and the view into her backyard from the road in front of her house was obscured by foliage and her house. From the road, the agents could not see much more than the front of the house. However, the vacant lot next door had recently been cleared of brush, giving the agents a "line of sight" into the backyard from a utility pole near the road. Because roadside surveillance was so difficult, the agents decided to install a camera on the pole. The utility company consented to the placement of the camera and hung a box to conceal it. The camera was installed on June 16, 2009, and remained active until July 10. It was placed to view Bagshaw's front yard and backyard, but it could not view the interiors of Bagshaw's house or barn. The camera had the capability to "pan as well as zoom" and streamed a live image via the internet that Agent Morgano could view at home or at the office. Over the 24 days the camera was in operation, the government recorded approximately 500 hours of footage. Images captured included Bagshaw mowing the lawn, raking, caring for and herding the alpacas, and pushing a wheelbarrow. Unfortunately, the camera also captured Bagshaw's husband naked and her son relieving himself against a tree. Based in part on the camera footage, the government obtained a search warrant for Bagshaw's home and confiscated thousands of documents and several home videos.

**Trial**

The government charged Bagshaw with 1 count of mail fraud in violation of 18 U.S.C. § 1341[2] (Count 1), 15 counts of making false statements to obtain federal employees' compensation

---

[2]18 U.S.C. § 1341 provides in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

in violation of 18 U.S.C. § 1920[3] (Counts 2-16), and 5 counts of making false statements in violation

of 18 U.S.C. § 1001 (Counts 17-21). Before trial, Bagshaw moved to suppress the footage from the

pole camera. After a hearing, the district court denied the motion. Bagshaw also asked the district

court to require the government to elect and/or dismiss counts of the indictment on the ground of

multiplicity, and the court denied this motion as well.

The trial was originally scheduled for July 25, 2011, but upon Bagshaw's motion the court

declared the case complex and postponed the trial until September 6. The parties filed a joint motion

to continue the trial for 180 days, but the court only partially granted the motion, designating October

11 as the final trial date. Bagshaw renewed her continuance request approximately three weeks

before trial, but the court denied the request again.

On October 4, Bagshaw filed a notice of expert evidence for a psychologist named Dr. Sandra

McPherson. Bagshaw's notice attached Dr. McPherson's curriculum vitae and stated she was

prepared to testify about Bagshaw's mental issues. The district court excluded this evidence for

failing to comply with Fed. R. Crim. P. 16(b)(1)(c) and Fed. R. Evid. 704(b).

---

pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . shall be fined under this title or imprisoned not more than 20 years, or both."

[3] 18 U.S.C. § 1920 provides in relevant part: "Whoever knowingly and willfully falsifies, conceals, or covers up a material fact, or makes a false, fictitious, or fraudulent statement or representation, . . . in connection with the application for or receipt of compensation or other benefit or payment under subchapter I or III of chapter 81 of title 5, shall be guilty of perjury, and on conviction thereof shall be punished by a fine under this title, or by imprisonment for not more than 5 years, or both."

Bagshaw's trial lasted six days. The government introduced 21 witnesses, the defense 5. The government showed the jury excerpts of footage from the cruise surveillance and the pole camera video. It also showed clips from Bagshaw's home videos that depicted Bagshaw caring for and showing the alpacas. It introduced two checks from YLEO, payable to Jim Bagshaw and signed over to Karen Bagshaw, totaling $243.46. The government introduced exhibits and testimony indicating that in 2008 Bagshaw traveled to Salt Lake City, Los Angeles, and Erie, Pennsylvania. The government called Elsie Pinchak, a neighbor who lived two doors down from Bagshaw, who testified to observing Bagshaw caring for the alpacas.

Notably, the only doctor to testify was Dr. Ahmeed Chauhan, Bagshaw's current physician. He testified that Bagshaw misrepresented her "physical capabilities and medical condition during her examinations," but said that in his opinion, Bagshaw was unable to return to "full-time" "remunerative employment."

The jury convicted Bagshaw of Counts 1-14 and acquitted her of Counts 15-21. Bagshaw was sentenced to one year and one day on Counts 1-14, to be served concurrently, with two years supervised release.

## II. ANALYSIS

### The Motion to Suppress

### A. Standard of Review

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *U.S. v. Johnson*, 656 F.3d 375, 377 (6th

Cir. 2011) (quotations omitted). "We construe the evidence in the light most favorable to the government." *Id.*

## B. Legal Principles

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A "search" occurs for purposes of the Fourth Amendment when the government invades an individual's reasonable expectation of privacy. *Smith v. Maryland*, 442 U.S. 735, 739-40 (1979) (discussing *Katz v. United States*, 389 U.S. 347 (1967)). This test involves two questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy was objectively reasonable. *Id.* at 740. An individual has a reasonable expectation of privacy in "curtilage," which is the area immediately surrounding a house that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (quotations omitted). However, an individual has no reasonable expectation of privacy in an "open field," the area outside a home's curtilage. *Oliver v. United States*, 466 U.S. 170, 179 (1984).

## C. Application

Bagshaw argues that the use of the pole camera violated the Fourth Amendment because her backyard was within the curtilage of her home, and she therefore had a reasonable expectation of privacy in that area. Citing Justice Alito's opinion concurring in the judgment in the Supreme Court's recent decision *United States v. Jones*, 132 S. Ct. 945 (2012), she further contends that the

voluminous quantity of video surveillance—constant footage for twenty-four days—invaded her reasonable expectation of privacy.

The district court rejected these arguments. It found that Bagshaw did not have a subjective expectation of privacy because she took no steps to conceal her backyard from her neighbors' views. It further found that even if Bagshaw had a subjective expectation of privacy, that expectation was not reasonable since the views from the camera were "identical to those available to a curious utility worker with a cheap pair of binoculars, or the disinterested glance of neighbors in either adjoining lot." Finally, the district court concluded that the Supreme Court's holding in *Jones* did not apply to Bagshaw's situation since the government agents never trespassed onto Bagshaw's property. It rejected Bagshaw's argument that the extent of the surveillance violated her reasonable expectation of privacy, reasoning that "[a] mounted camera . . . hardly creates the type of detailed portrait of a single subject's movements that might establish a privacy-implicating mosaic of information."

### 1. Fourth Amendment Considerations

The area behind Bagshaw's house can be divided into three distinct areas. The first is a grassy area directly behind the house that contained a picnic table, a clothesline, and what appears to be a gazebo of some sort. For convenience, we term this area the "backyard." Behind the backyard is a fenced-in area next to the barn—the "barnyard." Behind the barnyard in the far rear of the property is a fenced-in grassy area—the "pasture."

We decide curtilage issues based on the unique facts of each case. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598 (6th Cir. 1998). Whether an area falls within a home's curtilage is determined by considering four factors:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301 (1987). However, the "centrally relevant consideration" is " whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

Without a doubt, the "barnyard" and "pasture" areas were outside the curtilage of Bagshaw's home. These areas constitute "open fields," and Bagshaw had no reasonable expectation of privacy in them. Surveillance of these areas did not constitute a Fourth Amendment search. *See United States v. Vankesteren*, 553 F.3d 286, 291 (4th Cir. 2009) (Use of surveillance cameras to film an open field does not violate a reasonable expectation of privacy.).

However, application of the four factors directs us to find that the "backyard" constitutes curtilage. First, the "backyard" was in immediate proximity to the house. Second, it was essentially encircled by the house, the barn, the barnyard fence, and a line of trees along the edge of the vacant lot. Natural barriers can form an "enclosure" for purposes of curtilage. *See Daughenbaugh*, 150 F.3d. at 599. Although the "backyard" was visible through this tree line from the pole camera location on the vacant lot, "an area can be curtilage even where neighbors have a view of the area." *Hardesty v. Hamburg Tp.*, 461 F.3d 646, 653 (6th Cir. 2006). Third, the "backyard" contained a clothesline and a picnic table, which are generally associated with a domestic setting. *See United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (gardening and hanging laundry said to be "related to the intimate activities normally associated with the home"). Finally, although Bagshaw

- 12 -

evidently took no steps to hide the "backyard" from prying eyes, government agents testified that the view from the road was largely obscured by the house and foliage. We routinely find backyards to be part of a home's curtilage, and we see no reason not to do so here as well. *See Hardesty*, 461 F.3d at 653.

Our conclusion that the "backyard" is curtilage does not end our analysis, since law enforcement officers are entitled to observe things in plain sight from publicly accessible areas. In *California v. Ciraolo*, the Supreme Court stated that the fact "[t]hat the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." 476 U.S. 207, 213 (1986). Law enforcement officers may observe a home's curtilage "from a public vantage where [they] have a right to be and which renders the activities clearly visible." *Id.* at 213. In *Ciraolo*, the Court held that no reasonable expectation of privacy was invaded when the police used unenhanced visual surveillance from an aircraft in publicly navigable airspace to view the curtilage of the defendant's home. *Id.* at 215. The Court remarked that a person who "grows illicit drugs in his backyard" is not entitled to assume that "his unlawful conduct will not be observed by . . . a power company repair mechanic on a pole overlooking the yard." *Id.* at 214-15.

Testimony at the suppression hearing indicated that the "backyard" was visible from the adjacent vacant lot. Agent Morgano testified that the view into the "backyard" from the utility pole, which was located on the vacant lot near the road, was equally as good from ground level as from atop the utility pole. According to her testimony, the camera was placed at the top of the pole for

technical reasons, not to improve the vantage point. The footage from the pole camera confirms Agent Morgano's testimony. It shows that the vacant lot had recently been cleared of trees and undergrowth, rendering the view into the "backyard" largely unobstructed. From the footage, it appears that someone standing on the vacant lot near the road would have enjoyed the same view of the "backyard" that the pole camera possessed.

Since the "backyard" was visible from a publicly accessible location, the government agents were constitutionally permitted to view whatever portions of it were visible from this point. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). The government agents never physically invaded the "backyard." They merely observed it from a point where they had a right to be. *See United States v. Jackson*, 213 F.3d 1269, 1281 (10th Cir. 2000), *judgment vacated on other grounds by Jackson v. United States*, 531 U.S. 1033 (2000) (holding that using pole cameras to view outdoor areas surrounding a home and easily observable by people passing by does not violate the Fourth Amendment); *United States v. Jenkins*, 124 F.3d 768, 773-74 (6th Cir. 1997) (recognizing the difference between physical invasion of curtilage and "visual inspection from a lawful vantage point").

Nonetheless, we confess some misgivings about a rule that would allow the government to conduct long-term video surveillance of a person's backyard without a warrant. Few people, it seems, would expect that the government can constantly film their backyard for over three weeks using a secret camera that can pan and zoom and stream a live image to government agents. We are inclined to agree with the Fifth Circuit that "[t]his type of surveillance provokes an immediate

negative visceral reaction." *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (stating in dicta that using a pole camera to view curtilage over a 10-foot fence constitutes a Fourth Amendment search). We also note that *Ciraolo* involved a brief flyover, not an extended period of constant and covert surveillance.

Furthermore, it appears that at least five Justices of the Supreme Court share our concerns about certain types of long-term warrantless surveillance. *See United States v. Jones*, 132 S. Ct. 945 (2012) (Sotomayor, J., concurring and Alito, J., concurring in the judgment). But *Jones* involved GPS tracking, and it may be that the privacy concerns implicated by a fixed point of surveillance are not so great as those implicated by GPS tracking. The camera revealed only Bagshaw's activities outside in her yard—a fixed space which was open to public view. It did not "generate[] a precise record of [her] public movements that reflect[ed] a wealth of detail about her familial, political, professional, religious, and sexual associations" like a GPS device would do. *See id.* at 955 (Sotomayor, J., concurring). Ultimately, since we hold that any possible Fourth Amendment violation here would be harmless, we decline to decide whether long-term video surveillance of curtilage requires a warrant.

### 2. Harmless Error

Even if we concluded that use of the pole camera violated Bagshaw's Fourth Amendment rights because it captured images of her home's curtilage, we would find this violation harmless. "Not all Fourth Amendment violations require reversal." *United States v. Carnes*, 309 F.3d 950, 963 (6th Cir. 2002). Instead, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 23

(1967) (quotations omitted). To declare a Fourth Amendment violation harmless, we "must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24.

Any Fourth Amendment violation caused by the pole camera was harmless beyond a reasonable doubt. At trial, the jury was shown 12 minutes and 46 seconds of footage from the pole camera. This footage contained 44 separate clips from 12 different days during a period beginning June 17 and ending July 8. The vast majority of the footage showed Bagshaw in the frontyard, "barnyard," or "pasture" areas. Only five clips showed Bagshaw in the "backyard" area. These five clips total a mere 56 seconds. In these clips Bagshaw can be seen digging and bending over, pushing a lawn mower, and picking up a large object.

The relevance of these activities, if any, is to show the extent of Bagshaw's physical capabilities. But the best evidence by far of her physical capabilities was the cruise surveillance footage. The cruise footage shows Bagshaw bending and squatting on multiple occasions, raising her arms, rotating her torso, getting up from prone and sitting positions, lifting suitcases and other bags, and riding a motor scooter. Furthermore, the home movies leave no doubt that Bagshaw physically cared for the alpacas. They show that she was involved in birthing them, feeding them, shaving them, transporting them, and showing them. They contain a compelling clip showing Bagshaw wrestling down a rearing alpaca.

In light of this other visual evidence, the clips showing Bagshaw in the "backyard" were utterly insignificant to her convictions. Therefore, we hold that the introduction of these clips at trial was harmless beyond a reasonable doubt and affirm the denial of her suppression motion on this basis.

No. 12-3074
*United States v. Bagshaw*

**Motion for a Continuance**

**A. Standard of Review**

We review a district court's denial of a motion for a continuance for an abuse of discretion. *United States v. Crossley*, 224 F.3d 847, 854 (6th Cir. 2000).

**B. Legal Principles**

According to the Supreme Court, trial judges must be given "broad discretion" "on matters of continuance." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). "[O]nly an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the [Sixth Amendment] right to the assistance of counsel." *Id.* at 11-12 (quotations omitted). This Court has stated that "to demonstrate reversible error, the defendant must show that the denial [of the motion for a continuance] resulted in actual prejudice to his defense." *United States v. Crossley*, 224 F.3d 847, 855 (6th Cir. 2000) (quotations omitted). To demonstrate actual prejudice, the defendant must "show[] that a continuance would have made relevant witnesses available or added something to the defense." *Id.* (quotations omitted). When a defendant claims insufficient preparation time, we examine the totality of the circumstances. *United States v. Medina*, 992 F.2d 573, 581 (6th Cir. 1993), *abrogated on other grounds by United States v. Jackson-Randolph*, 282 F.3d 369, 390 (6th Cir. 2002).

**C. Application**

In arguing that she was granted insufficient time to prepare for trial, Bagshaw points to the volume of discovery her counsel faced. The record indicates that the government possessed 22 bankers boxes of documents, over 500 hours of video footage, three hard drives, and several thumb

drives. Bagshaw claims that the time between her arraignment on June 21, 2011, and the ultimate trial date on October 11, 2011, was not enough time for her counsel to sort through the materials the government had accumulated during its investigation. She states that her counsel received documents "as late as 10 days before trial" and that despite counsel's best efforts, "counsel was unable to review all of the footage for its effective use at trial."

Bagshaw claims that she was prejudiced by the time constraint in several ways. First, she would have been able to rebut the pole camera footage used by the government by editing the footage to show that she did not continuously perform farm work and that she required extended rest after working outside. Second, she might have been able to produce her Office of Personnel Management disability file showing that she was eligible for and receiving disability retirement during a portion of the time covered by the indictment. Third, she would have gained sufficient time to present Dr. McPherson's testimony.

The government counters by contending that discovery materials were provided with sufficient time to review them before the trial. It points out that Bagshaw hired a data management company to review the pole camera footage, and that during trial Bagshaw's counsel provided the prosecution with a sixty-five-page spreadsheet detailing all the activities captured in the 500 hours of footage. It argues that Bagshaw could not have used the pole camera footage to show herself resting indoors, and that only Bagshaw or a member of her household could testify to her need for rest after working outside. It disputes the relevancy of evidence relating to Bagshaw's eligibility for disability retirement. Finally, the government argues that more time would not have enabled Dr.

McPherson to testify. Therefore, the government asserts that Bagshaw was not prejudiced by the district court's refusal to grant a continuance.

Ultimately, it cannot be said that the district court abused its discretion by denying Bagshaw's motion for a continuance. Bagshaw has not demonstrated either that she was given insufficient time to prepare for trial or that the alleged lack of time prejudiced her defense.

Despite the large volume of discovery material held by the government, Bagshaw's counsel had sufficient time to review it and prepare for trial. Bagshaw was indicted on June 9, 2011, and arraigned on June 21. The trial date was first set for July 25, but it was postponed twice—first to September 6 and then to October 11. In its brief, the government states that it began supplying materials to Bagshaw's counsel as early as August, 2010. On the day of Bagshaw's arraignment, the government provided Bagshaw's counsel with a letter briefly summarizing the materials it held. The record reflects that Bagshaw's counsel received substantial quantities of materials, including documents and electronic records, on July 13, August 1, and August 11. Bagshaw's counsel was allowed to review all the boxes of evidence at the U.S. Attorney's office on August 15 and 18. Although Bagshaw states that her counsel received 2000 pages of documents within three weeks of trial, she does not explain what those documents contained or why she was prejudiced by receiving them at such a late date. Bagshaw states that her counsel received documents ten days before trial, but the government has explained that those documents were *Jencks* Act material. Bagshaw's reply brief does not dispute this explanation. Furthermore, Bagshaw was represented by three attorneys at trial, so it does not appear that one attorney was required to review all the evidence alone.

The record does not support Bagshaw's argument that she was prejudiced by not having sufficient time to review the pole camera footage. Bagshaw received the hard drive containing the pole camera footage on July 26, approximately two and a half months before the October 11 trial. Although evidently Bagshaw's counsel had some difficulty viewing the footage, that issue was resolved by August 5. Therefore, Bagshaw's counsel possessed viewable footage over two months before trial. Of course, it would have been impractical for Bagshaw's counsel to personally review all 500 hours of footage, but she could have (and ultimately did) hired a data management company to do the job. It is unclear from the briefs and the record when exactly the company finished reviewing the footage, but at least by the end of the defense's case, Bagshaw's counsel possessed a detailed spreadsheet summarizing the footage by date, time, and activity. The prosecution stated it would not object if Bagshaw's counsel called as a witness the individual who prepared the spreadsheet, but evidently Bagshaw's counsel did not seek to do so.

Even assuming that Bagshaw did not have sufficient time to review the pole camera footage, she likely would not have been prejudiced. As the government points out, the footage would not have shown Bagshaw resting after working outdoors. Also, it seems unlikely that Bagshaw would have edited the video to show long portions where she was not performing farm chores. Testimony from friends or family members with personal knowledge of Bagshaw's alleged need for rest would have been a much more efficient way to prove these points.

It is unclear how Bagshaw's eligibility for disability retirement benefits would have been relevant to her defense. She was charged with mail fraud and making false statements to obtain federal workers' compensation benefits, and her eligibility for or receipt of benefits under another

system would have little or no bearing on her guilt or innocence for these crimes.  David Cattani repeatedly testified that the OWC program was not equivalent to a retirement system.  Bagshaw has not clarified how documents relating to disability retirement are relevant to the crimes charged.

Finally, Bagshaw was not prejudiced by the alleged lack of time to present Dr. McPherson's testimony. Bagshaw's asserted inability to present Dr. McPherson's testimony is her strongest argument here.  The government urges us to find that Bagshaw was not prejudiced because Dr. McPherson's testimony was inadmissible anyway under Fed. R. Evid. 704(b).  However, as explained below we do not reach the issue of whether Dr. McPherson's testimony was admissible under Rule 704(b).  Instead, we find that Bagshaw was not prejudiced because her counsel had sufficient time to call Dr. McPherson as a witness.

Bagshaw claims that her attorney did not encounter the possibility of mental health issues until she reviewed the last box of discovery materials.  This box contained evidence that "Bagshaw sought mental health assistance in 2001 from an employee assistance program."  According to Bagshaw, this discovery prompted her counsel to immediately hire Dr. McPherson to conduct a mental health exam.

Bagshaw's rationale for why her counsel waited so long to solicit Dr. McPherson's opinion is implausible.  Bagshaw herself was the one who sought the mental health assistance in 2001, so she had knowledge of the incident.  Furthermore, even if she had forgotten about it, her brief states that almost two months before she filed notice of Dr. McPherson's testimony, another psychologist named Dr. Delaney diagnosed her with "anxiety disorders; forms of depression; and schizoid personality disorders." Bagshaw draws parallels between the conclusions reached by Dr. McPherson

and Dr. Delaney to show that the government was prepared to handle Dr. McPherson's testimony by consulting Dr. Delaney's evaluation. Bagshaw never asserts that her own counsel did not know of Dr. Delaney's diagnosis. So Bagshaw's own arguments show that her counsel almost certainly knew of possible mental health issues well before examining the last box of discovery materials. Bagshaw's brief also refers to several other sources indicating that she had mental health issues, and Bagshaw does not claim that these sources were also located in the last box her counsel reviewed.[4] Therefore, the claim that Bagshaw's counsel was surprised by the document in the last box of discovery materials seems highly improbable. Bagshaw was not hindered from calling an expert witness by the district court's denial of her motion for a continuance.

In sum, we hold that the district court did not abuse its discretion by denying Bagshaw's motion for a continuance.

## Exclusion of Expert Testimony

## A. Standard of Review

We review a district court's evidentiary rulings, including the exclusion of expert evidence, for an abuse of discretion. *United States v. Langan*, 263 F.3d 613, 620 (6th Cir. 2001); *United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004).

---

[4]The government points out that at least one of these other sources, which Bagshaw herself describes as "replete with references to Bagshaw's depression and anxiety," was received by Bagshaw's counsel on August 1.

**B. Legal Principles and Application**

Bagshaw argues that the district court abused its discretion by excluding Dr. McPherson's expert testimony regarding Bagshaw's mental health. The district court excluded this testimony on two grounds.[5] First, it concluded that Bagshaw's summary of Dr. McPherson's testimony was inadequate under Fed. R. Crim. P. 16. Second, it concluded that Dr. McPherson's testimony was inadmissible under Fed. R. Evid. 704(b) because it went to "whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." Additionally, the government urges us to affirm based on Bagshaw's late notice under Fed. R. Crim. P. 12.2(b). For the reasons stated below, we affirm based on Fed. R. Crim. P. 16. Therefore, we need not consider the other two alternative grounds.

The district court concluded that Bagshaw's summary of Dr. McPherson's testimony was inadequate under Fed. R. Crim. P. 16(b)(1)(C). That rule requires the defendant, at the government's request, to give the government a "written summary" of expert testimony if the defendant gives notice of "an intent to present expert testimony on the defendant's mental condition." Fed. R. Crim. P. 16(b)(1)(C). The rule specifies that "[t]his summary must describe the witness's opinions, the bases and reasons for those opinions, and the witnesses's qualifications." *Id.* Failure to comply with this rule allows the district court to exclude the expert testimony. Fed. R. Crim. P. 16(d)(2)(C). Well before trial, the government requested a summary of expert testimony.

---

[5]Bagshaw claims that the district court excluded Dr. McPherson's testimony on a third ground—Fed. R. Evid. 702. However, the portion of the record Bagshaw cites for this proposition involves a different witness. It appears that the district court relied on only two grounds.

To support her contention that she provided an adequate written summary to the government, Bagshaw points to her Notice of Expert which she filed one week before trial. Attached to the Notice of Expert was Dr. McPherson's curriculum vitae. Bagshaw summarized Dr. McPherson's opinions and the bases and reasons for those opinions as follows:

> Defense counsel anticipates that Dr. McPherson will testify regarding the results of her examination last week of Karen Anderson-Bagshaw. Based on this evaluation and testing, Dr. McPherson is prepared to testify regarding numerous psychological concerns and conditions exhibited by Ms. Anderson-Bagshaw, including chronic depression, schizoaffective disorder, intelligence testing, and limited verbal comprehension. Her testimony will include opinions as to how these mental conditions effect [sic] the Defendant's medical conditions, and the Defendant's ability to respond to questions presented to her. Dr. McPherson will also testify about the specific origins of the mental conditions of Ms. Anderson-Bagshaw, which includes both genetic predisposition and situational influences.

The detailed curriculum vitae probably demonstrated Dr. McPherson's qualifications, and the government does not specifically argue otherwise. The real issue is whether Dr. McPherson's opinions and the bases and reasons for those opinions were adequately summarized. The district court concluded that they were not, and its conclusion was not an abuse of discretion.

First, the summary inadequately describes Dr. McPherson's opinions. It does, of course, identify some of them. It indicates that Dr. McPherson concluded that Bagshaw suffered from several specific mental conditions. But the summary only vaguely says that Dr. McPherson had "opinions" about how those mental conditions affected Bagshaw's "ability to respond to questions." It does not identify what those opinions were. The whole reason for Dr. McPherson's testimony was to show that Bagshaw did not act with the specific intent to defraud. Dr. McPherson's opinions about Bagshaw's ability to respond to questions were therefore the most crucial aspect of her

testimony. Since the summary does not at all identify those opinions, the district court did not abuse its discretion in concluding that the summary was inadequate.

Second, the summary inadequately describes the bases for Dr. McPherson's opinions. The only bases Bagshaw gave were an "examination," an "evaluation," and "testing." These bases are extremely vague and could not have helped the government prepare to cross examine Dr. McPherson. In one of the cases Bagshaw cites, the government's summary of expert testimony at least provided a nonexclusive list of general reasons for the expert's opinion. *See United States v. Conroy*, 424 F.3d 833, 838 (8th Cir. 2005). Even so, the court in *Conroy* noted approvingly the district court's advice to the government that its future expert testimony summaries should be more "enlightening." *Id.* at 838 n.2.

According to the Advisory Committee Notes to Rule 16, the summary of expert testimony "should cover not only written and oral reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." Fed. R. Crim. P. 16, advisory committee's note (1993). The Court of Appeals for the District of Columbia found that a summary of expert testimony was inadequate in part because it did not "state what [the expert] had concluded from any individual test result, interview, or expert report," even though the summary contained a "page-long list of tests [the expert] had performed." *United States v. Day*, 524 F.3d 1361, 1371-72 (D.C. Cir. 2008). Bagshaw's summary listed not a single test that Dr. McPherson performed, much less the specific conclusions reached from each test. Not until trial did the government learn which tests Dr. McPherson had

performed. Without at least a list of the tests, the government could not have adequately prepared to cross examine her.

In short, Bagshaw's summary of Dr. McPherson's testimony did not describe the most important of Dr. McPherson's opinions. It wholly failed to specify the bases for Dr. McPherson's opinions. In her defense, Bagshaw's counsel filed the summary the same day she learned of Dr. McPherson's findings. However, at the very least counsel could have listed in the summary the tests that Dr. McPherson performed. Counsel did not do so. Therefore, the district court's decision to exclude the testimony under Rule 16 was not an abuse of discretion.

## **Multiplicity**

## **A. Standard of Review**

The parties disagree on the correct standard of review for a claim of multiplicity. Citing a 1990 case from this Court, the government claims that we apply an abuse of discretion standard. *See United States v. Throneburg*, 921 F.2d 654, 657 (6th Cir. 1990). Bagshaw argues that we apply a *de novo* standard.

Bagshaw is correct. *Throneburg's* abuse of discretion standard does not apply when the defendant is claiming that he was convicted and sentenced for multiplicitous counts in violation of the Double Jeopardy Clause. Instead, it applies when the district court allowed multiplicitous counts to go to the jury and then merged the multiplicitous convictions after the jury verdict. *See United States v. McCafferty*, No. 11-3845, 2012 WL 1970777, at *8 (6th Cir. June 4, 2012); *United States v. Tocco*, 306 F.3d 279, 289 n.12 (6th Cir. 2002). Other cases from this Court demonstrate that when a defendant is claiming that he or she has been convicted and sentenced for multiplicitous counts in

violation of the Double Jeopardy Clause, we apply a *de novo* standard of review. *See United States v. Richards*, 659 F.3d 527, 547 (6th Cir. 2011) (quoting *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008)); *see also* 1A Charles Alan Wright et al., Federal Practice and Procedure § 142 (4th ed.) ("Whether an indictment is multiplicitous or duplicitous is a question of law that appellate courts review de novo."). Therefore, we review Bagshaw's claim of multiplicity *de novo*.

## B. Legal Principles

"'Multiplicity' is charging a single offense in more than one count in an indictment." *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008) (quotations omitted). Multiplicity violates the Double Jeopardy Clause because it "result[s] in a defendant being punished twice for the same crime." *Id.*

In a crime involving a false statement, separate false statements are "entirely separate offenses." *United States v. Dedman*, 527 F.3d 577, 600 n.10 (6th Cir. 2008) (involving a violation of 18 U.S.C. § 1001— making false statements to a federal agent). But when a defendant is charged with multiple counts of making false statements that concern the same subject matter, there is a danger that the defendant could be convicted multiple times for making essentially the same statement. The issue here is whether any of Bagshaw's multiple false statements were so closely related as to constitute the "same crime."

In an unpublished decision, we held that "two separate perjury counts were plainly multiplicitous [when] they involve[d] separate responses to essentially the same question." *United States v. Ragland*, 3 Fed. App'x 279, 284 (6th Cir. 2001). In *Ragland*, the defendant appeared before a grand jury and was twice asked the same question: Who called her daughter to tell the daughter to

remove drug money from a home about to be searched. *Id.* at 282. Both times, the defendant falsely stated that she, the defendant, placed the call. *Id.* This Court observed that "[t]he law is well established that a single lie merits only one punishment." *Id.* at 284. Therefore, "[i]t was improper to charge and punish the Defendant more than once for her answers to the same rephrased questions." *Id.*

However, when the multiple counts of false statements involve different questions and different responses, the defendant may properly be convicted of multiple crimes, even if all the false statements relate to the same topic. The Fifth Circuit has stated that "an obstruction of justice indictment is not multiplicious [sic] when it contains charges for separate and distinct acts of perjury, even if the acts are all related and arise out of the same transaction or subject matter, *if they require different factual proof of falsity.*" *United States v. Sharpe*, 193 F.3d 852, 865 (5th Cir. 1999) (emphasis added).

In close cases, some circuits apply what the Eighth Circuit has called the "unitary harm rule." *See United States v. Graham*, 60 F.3d 463, 467 (8th Cir. 1995). This rule originated in the Ninth Circuit. It holds that "the government may charge separate violations for *identical false statements* under section 1001(a)(2) [making false statements to government agents] if: (1) the declarant was asked the same question and gave the same answer; and (2) the later false statement further impaired the operations of the government." *United States v. Stewart*, 420 F.3d 1007, 1013 (9th Cir. 2005) (emphasis added). Although both parties reference this "unitary harm rule" in their briefs, it does not appear that we adopted it. *See United States v. Lacefield*, 146 Fed. App'x 15, 20 (6th Cir. 2005) (noting that "the Sixth Circuit has never adopted or relied upon a 'unitary harm' rule"). As explained

below, we need not now decide whether to adopt this rule, since by its terms it applies when the government has charged separate counts for "identical false statements." Here, all the questions were distinct and none of Bagshaw's statements were identical.

## C. Application

In order to analyze the alleged multiplicity of the counts contained in the indictment, it is necessary to briefly summarize the questions and false statements made by Bagshaw. All the counts Bagshaw claims are multiplicitous arose out of the QAR interview conducted by Agent Jeffrey Dancer on December 10, 2009. Agent Dancer first asked Bagshaw a series of questions, which became the bases for Counts 7-14. He then helped her fill out a 1032 form, which became the basis for Count 4. The following is a summary, adopted from the indictment and the interview transcript, of the relevant counts.

> **Count 4:** Bagshaw failed to disclose the extent of her work activities outside her federal job during the claimed period when asked whether she was self-employed or involved in any business enterprise during the past 15 months.
>
> **Count 7:** Bagshaw stated that her back pain consumed her when asked to describe her pain.
>
> **Count 8:** Bagshaw stated that her husband took care of the alpacas and ran the business in response to a question about her investment in the alpaca farm.
>
> **Count 9:** Bagshaw answered "No" when asked whether she physically cared for the animals.
>
> **Count 10:** Bagshaw answered "No" when asked whether she received any income from any business or investment activities.
>
> **Count 11:** Bagshaw answered "No" when asked whether she engaged in volunteer activities.

**Count 12:** Bagshaw answered "No" when asked whether she was driving in relation to the alpaca business.

**Count 13:** Bagshaw replied that she traveled to Las Vegas in January when asked whether she had left Ohio in the past year.

**Count 14:** Bagshaw answered "No" when asked whether she thought she could work limited duty or limited hours.

A brief review of the above summary demonstrates that none of these nine counts are multiplicitous. They all involve different responses to different questions. Unlike the false statements in *Ragland*, these statements are not merely the same response to a rephrased question. Bagshaw contends that all the counts involve "just two facets of inquiry—business activities and physical ability." Even so, each one of the statements required different factual proofs of falsity. Therefore, none of the statements were multiplicitous. And since none of the statements were identical, we need not now decide whether to adopt the "unitary harm" rule followed by other circuits.

**Sufficiency of the Evidence**

**A. Standard of Review**

We review a district court's ruling denying a motion for judgment of acquittal *de novo*. *United States v. McGee*, 529 F.3d 691, 696 (6th Cir. 2008). We will affirm the district court's ruling "if the evidence, viewed in the light most favorable to the government, would allow a trier of fact to find the defendant guilty beyond a reasonable doubt." *Id.* (quotations omitted).[6]

---

[6]Bagshaw cites to a May 1995 decision from this Court for the proposition that "'materiality is a conclusion of law that must be fully supported by the evidence, direct or circumstantial' and this

**B. Application**

The district court summarily denied Bagshaw's motion for a judgment of acquittal. Bagshaw claims that there was insufficient evidence presented at trial to prove the charges against her. The evidence for several of the counts was scarce—certainly not "overwhelming" as the government claims. However, for each of the fourteen counts, there is evidence in the record from which a reasonable juror could conclude that Bagshaw was guilty. Therefore, we affirm the district court's ruling.

*1. Count 1: Mail Fraud*

The district court instructed the jury that to find Bagshaw guilty of mail fraud under 18 U.S.C. § 1341, it had to find that the government proved the following four elements beyond a reasonable doubt: (1) Bagshaw knowingly devised a scheme to defraud in order to obtain money or property; (2) the scheme included a material misrepresentation or a concealment of a material fact; (3) Bagshaw had an intent to defraud; and (4) Bagshaw used the mails in furtherance of this scheme. *See United States v. Martinez*, 588 F.3d 301, 316 (6th Cir. 2009).

---

Court reviews a finding of materiality de novo." *See United States v. LeMaster*, 54 F.3d 1224, 1230 (6th Cir. 1995). Although the government does not contest this statement, Bagshaw is wrong. The rule she cites has not been good law since June 1995, when the Supreme Court unanimously held that "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged," including the materiality of a false statement. *United States v. Gaudin*, 515 U.S. 506, 522-23 (1995); *see also United States v. Rogers*, 118 F.3d 466, 470-71 (6th Cir. 1997) (noting that *Gaudin* "overruled Sixth Circuit precedent regarding who decides the question of 'materiality' in a prosecution under 18 U.S.C. § 1001").

Bagshaw argues that, contrary to the government's allegation that her scheme to defraud began in 2002, there was no evidence indicating that she began any scheme to defraud until 2005 when she completed the first 1032 form. However, the government points to a letter from Bagshaw dated September 10, 2002, that referred to the early hours limited duty job offer and stated that she "stopped working mainly because they changed my job offer." Bagshaw filed her recurrence notice in June, 2002, and she was granted total disability payments for that same month. Therefore, it cannot be said that no reasonable juror could have believed that a scheme to defraud began in 2002.

Bagshaw returned the 1032 forms using the US mail. Based on the discussion below, we conclude that a reasonable juror could have found that Bagshaw devised a scheme to defraud, with the intent to defraud, and that the scheme included a material misrepresentation.

### 2. Counts 2-14: False Statements to Obtain Workers' Compensation Benefits

The district court instructed the jury that to find Bagshaw guilty of making false statements to obtain workers' compensation benefits under 18 U.S.C. § 1920, it had to find that the government proved the following elements beyond a reasonable doubt: (1) Bagshaw made a statement; (2) the statement was false, fictitious or fraudulent; (3) the statement was material; (4) the statement was made knowingly and willfully; and (5) the statement was made in connection with the application for or receipt of federal workers' compensation benefits. *See United States v. Moore*, 29 Fed. App'x 222, 224 (6th Cir. 2002). "A statement is material if it has a natural tendency to influence or is capable of influencing the decision-maker to which it is addressed." *Id.* at 225 (citing *United States v. Gaudin*, 515 U.S. 506, 509 (1995)).

Bagshaw argues that any misrepresentation of her physical abilities was immaterial because "there was no medical testimony presented that Bagshaw is able to return to work." If the government had presented medical testimony that Bagshaw was not totally disabled, it seemingly would have bolstered the government's case substantially. It is somewhat puzzling that the government presented no such testimony. Nonetheless, the government was not required to prove that Bagshaw was able to return to work. The jury was not tasked with deciding whether Bagshaw was entitled to disability benefits. Instead, the government was only required to prove that Bagshaw misrepresented her physical abilities and that this misrepresentation was material.

Bagshaw spends little time denying that she made false statements. Instead, she primarily argues that her statements were not material, a required element for both the crime of mail fraud and the crime of making false statements to obtain workers' compensation benefits. Repeatedly, Bagshaw argues that "[t]he government failed to present evidence that misrepresentations made by Bagshaw, if indeed there were any, would have resulted in the discontinuation or reduction of her benefits by OWC." However, this line of argument is misplaced. Materiality is not such a high hurdle. The test for materiality does not demand that Bagshaw's benefits would have been discontinued or reduced absent any given misstatement. Instead, the question is whether Bagshaw's false statements were capable of influencing the decision-maker to which she made them. For the reasons stated below, the government introduced sufficient evidence from which a reasonable juror could find that Bagshaw's false statements were material.

### a. Counts 2-5: False Statements on 1032 Forms

The 1032 forms required Bagshaw to "[r]eport ALL self-employment or involvement in business enterprises," including "farming; sales work; operating a business . . . ; providing services in exchange for money, goods, or other services" and "activities such as keeping books and records, or managing and/or overseeing a business of any kind, including a family business." It further required her to "[r]eport ANY work or ownership interest in any business enterprise, even if the business lost money." Yet Bagshaw never listed any such activities on the forms except investing in alpacas.[7] The pole camera video and the home movie clips depicted Bagshaw physically caring for the alpacas. Bagshaw's neighbor Pinchak testified that Bagshaw cared for the alpacas 75 percent of the time. Pinchak stated that she "rarely" saw Jim Bagshaw helping with the farm. The government introduced evidence of YLEO commission checks from 2008 totaling $243.46, indicating that Bagshaw received outside income.[8]

The 1032 forms further required Bagshaw to say whether she had "perform[ed] any volunteer work for which ANY FORM of monetary or in-kind compensation was received." Bagshaw wrote

---

[7]Bagshaw argues that she used the term "invest" in an active sense and therefore was not engaging in a deliberate scheme to defraud. Evidently she use the word in this sense when talking with Agent Morgano at the alpaca event. But during the QAR interview, she used the word "invest" in a strictly passive sense.

[8]Bagshaw argues that these checks were "rebates" and "not true 'commissions' or income." But a reasonable juror could have concluded that these checks were for commissions, as indicated by Casey Harris, legal counsel for YLEO. Also, although the checks were payable to Jim Bagshaw and endorsed over to Karen, there is evidence in the record that Karen was the one primarily involved in selling the YLEO products.

"no." Yet an exhibit the government introduced at trial showed that Bagshaw received a complementary stall, valued at $25, for volunteering as a clerk at an alpaca show in March 2008.

Testimony introduced by the government indicated that misrepresentations as to business activities were material. David Cattani, a senior claims examiner with the OWC, testified that the accuracy of a claimant's reporting "[was] everything to us, because again, we don't see anything for ourselves. We rely on what the claimant tells us." The accuracy was crucial because "all [the claimant's] benefits are always contingent upon the injury being ongoing. As soon as [the OWC] can establish that the injury is no longer there, then [the claimant is] not entitled to benefits any more."

Cattani further testified that statements about activities and earnings were significant because benefits would be offset by any earning potential, and the OWC would compare activities listed for consistency with the medical opinions. Cattani stated that it was "significant" not to have farming activities included on the 1032 forms. He also testified that it would be "significant" not to include activities as a salesperson or distributor of retail products because it "would show not only earnings, but the capacity to run a business [or] do sales marketing." He explained that the reporting "has nothing to do with the income generated, it is the work being performed, which is a demonstration of your ability to do something, and then we assign a value to that work to offset the wages."

Based on this testimony, we conclude that Bagshaw's misrepresentations as to her business activities on the 1032 forms were material. We view the statement denying the receipt of compensation for volunteer activities to be immaterial. The only evidence of such compensation was a complementary stall worth $25. In our view, this amount is so negligible as to render the false statement immaterial. We also doubt whether the small amount of money received as YLEO

commissions was material. Nonetheless, Bagshaw was convicted for her misstatements on the forms as a whole. Each form falsely represented that Bagshaw only invested in alpacas, and these false statements were material. Therefore, a reasonable juror could have found that Bagshaw made material false statements on each of the four 1032 forms.

Bagshaw also argues that she did not have a specific intent to defraud when answering the questions on the 1032 forms because she did not understand the questions. She points to a record of a 2004 phone call in which she asked an OWC representative questions about an overpayment. The notation on the call record indicates that Bagshaw was confused and wanted assistance completing forms. However, the note also states that Bagshaw was told that she could receive assistance with questions, although the OWC could not complete the forms for her.

Bagshaw also points to the QAR interview, in which she told Agent Dancer that she did not know what else to list for business activities except for investing in alpacas. However, the interview transcript demonstrates that she clarified for Agent Dancer that her only activity was "providing funding" and that she was doing no care or bookkeeping. Despite these examples of possible confusion, a reasonable juror could conclude that Bagshaw acted with the intent to defraud when completing the 1032 forms.

### b. Count 6: Misrepresentations to Dr. Chauhan

Dr. Chauhan viewed a video compilation showing Bagshaw engaging in various activities. His opinion after viewing the video was that Bagshaw misrepresented her "physical capabilities and medical condition during her examinations." He further testified that he was "surprised at how much she was able to do on the videotape."

The evidence supporting this particular count is probably the weakest of the fourteen counts, because much of Dr. Chauhan's testimony indicated that Bagshaw's misrepresentations were not material. Dr. Chauhan testified that Bagshaw's misrepresentations to him were of a low degree and were not material to his treatment because it was focused on alleviating her pain levels. He performed an objective test known as the "Waddell test" to ensure that Bagshaw was not falsifying her levels of pain. He stated that he had no concerns that she was feigning her back pain. Despite her pain, he had encouraged Bagshaw to be active, since it was important for patients suffering from chronic pain to occupy themselves and distract themselves from their pain. He stated that Bagshaw's back issues did not impose any physical restrictions, and that she could be "as active as she [could] tolerate." Even after watching the video, he testified that in his opinion Bagshaw was unable to return to "full-time" "remunerative employment."

However, some of Dr. Chauhan's testimony supports the jury's finding. He stated that he relied heavily upon Bagshaw's subjective statements about her pain when treating her. He observed that "pain is a very emotional and personal experience." He stated that he tended to perform the objective tests to rule out misrepresentation of pain early in the process of treating patients, and he began treating Bagshaw in November, 2002. He did not retain Bagshaw's Waddell test findings. Although he did not think Bagshaw was capable of "full-time" employment and was concerned with her ability to work on a regular basis, he seemed to leave open the possibility that she could work part-time.

David Cattani testified that due to the volume of claims, the Department of Labor was "basically totally reliant" on the medical evidence it received. He further stated that "[w]hat

[claimants] tell their doctor is very important, too, because that trickles down in the medical opinion as to what they can and cannot do." Cattani stated that the USPS "work[ed] very hard" at accommodating the disabilities of its workers. He testified that their forms often stated they could "accommodate anything short of bed rest." Based on these statements, a reasonable juror could have found that Bagshaw's misrepresentations to Dr. Chauhan were material.

### c. Count 7: Level of Back Pain

After viewing footage of Bagshaw caring for her alpacas and hearing evidence of Bagshaw volunteering at an alpaca convention, attending the YLEO conventions, and traveling, a reasonable juror could have concluded that Bagshaw misrepresented the consuming level of her back pain.

Further, a reasonable juror could have concluded that this statement was material. Bagshaw argues that the transcript from the QAR interview was never made part of her Department of Labor Office of Workers' Compensation file, and therefore statements it contained could have not have influenced the Department's decisions regarding benefits. However, Agent Dancer testified that statements made during the QAR interview prompted the Office of Inspector General to continue its investigation and commence surveillance. From this testimony, a reasonable juror could have concluded that Bagshaw's statements during the interview influenced the actions of the Department of Labor.

Bagshaw furthers argues that the statements made during the QAR interview were not made in connection with the application for or receipt of benefits—a required element of making false statements to obtain workers' compensation—because the QAR interview was designed to gather evidence for prosecution, not to determine whether Bagshaw was entitled to benefits. However, a

reasonable juror could have concluded that the QAR interview was made in connection with the application for or receipt of benefits because Agent Dancer stated that the purpose of the interview was to investigate workers' compensation fraud.

### d.  Count 8: Husband Caring for Alpacas

After hearing Pinchak testify that Bagshaw cared for the alpacas 75 percent of the time and that Jim Bagshaw "rarely" cared for them, and after viewing the pole camera footage and home movie clips, a reasonable juror could have concluded that Bagshaw misrepresented her involvement in the alpaca business.  A reasonable juror could also have concluded that this misrepresentation was material.

### e.  Count 9: No Physical Involvement with the Alpacas

After viewing the pole camera footage and home movie clips and hearing Pinchak testify that Bagshaw cared for the alpacas 75 percent of the time, a reasonable juror could have concluded that Bagshaw misrepresented her physical involvement with the alpaca farm.  A reasonable juror could also have concluded that this misrepresentation was material.

### f.  Count 10: No Income from Business or Investment Activities

After hearing evidence about Bagshaw's receipt of funds from the YLEO checks and the sale of an alpaca, a reasonable juror could have concluded that Bagshaw misrepresented her receipt of income from any business or investment activities.  Although the $243.46 received as YLEO commissions was minimal, the $1,200 received from the 2005 alpaca sale was more significant.  Also, testimony indicated that the OWC was interested primarily in the work capability represented by the receipt of funds, not the amount of funds received.

### g. Count 11: No Volunteer Activities

After hearing evidence about Bagshaw's volunteering at the alpaca show, a reasonable juror could have concluded that Bagshaw misrepresented her lack of volunteer activities. Testimony indicated that any volunteer work would indicate to the OWC that the applicant was able to perform some type of work.

### h. Count 12: No Driving for Alpaca Business

After hearing testimony that Bagshaw transported an alpaca, a reasonable juror could have concluded that Bagshaw falsely stated that she was not driving for her alpaca business. A reasonable juror could have viewed this false statement as material, since if Bagshaw had stated that she drove in connection with the alpaca business, she would have undercut her other statements about being only passively involved.

### i. Count 13: No Traveling

After hearing evidence that Bagshaw traveled to Salt Lake City, Los Angeles, and Erie, Pennsylvania, a reasonable juror could have concluded that Bagshaw falsely represented that she only traveled to Las Vegas. A reasonable juror could also have concluded that this misrepresentation was material. Disclosure of this significant amount of traveling would have indicated that Bagshaw's pain was not as consuming as she indicated.

### j. Count 14: No Ability to Work Limited Duty or Limited Hours

After hearing evidence of Bagshaw's farm work, volunteering, conference attendance, and traveling, a reasonable juror could have concluded that Bagshaw falsely stated that she was unable

to work limited duty or limited hours. Had Bagshaw stated that she thought she was able to return to limited duty, that statement almost certainly would have influenced Agent Dancer's actions.

In sum, the government presented evidence to support each element of the counts charged. Although the evidence was somewhat scarce, a reasonable juror could have found Bagshaw guilty of each one of the counts. Therefore, we affirm the district court's denial of Bagshaw's motion for judgment of acquittal.

## III. CONCLUSION

We reiterate our uneasiness with the 24/7 video surveillance of curtilage conducted in this case. Were we deciding a case where the footage captured within the curtilage was capable of affecting the jury's decision, our holding might be different. But we decline to announce a new rule where the Fourth Amendment violation, if any, was harmless. Therefore, for the reasons discussed above, we **AFFIRM**.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** In this case, the Government—without a warrant—used a hidden video camera to monitor surreptitiously and continuously Bagshaw's activities on her private, residential property for twenty-four days. Because this kind of long-term video surveillance invaded Bagshaw's legitimate expectation of privacy, I would hold that the Government's conduct violated the Fourth Amendment right to be free from unreasonable searches.

## I.  FOURTH AMENDMENT ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. In evaluating whether a search was reasonable under the Fourth Amendment, we ask "whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). The district court found that Bagshaw did not have a reasonable expectation of privacy because the area being continuously filmed was "visible from either adjoining lot," and therefore Bagshaw's activities were knowingly exposed to the public. *See United States v. Anderson-Bagshaw*, No. 1:11–CR–257, 2011 WL 3901880, at *3 (N.D. Ohio Sept. 6, 2011). This analysis relies on prior cases holding that "[a]s a general proposition, the police may see what may be seen 'from a public vantage point where [they have] a right to be.'" *Florida v. Riley*, 488 U.S. 445, 449 (1989) (quoting *Ciraolo*, 476 U.S. at 213). For example, the Court upheld against a Fourth Amendment challenge aerial observation from "public navigable airspace" of an individual's marijuana plants in his backyard. *Ciraolo*, 476 U.S. at 213. The Court held that an individual could

not legitimately expect privacy in his backyard against "physically nonintrusive" observation by the government when such a view was readily available to "a power company repair mechanic on a pole overlooking the yard." *Id.* at 213, 215. The majority likewise finds this precedent decisive as to the video footage of Bagshaw's backyard area.[1] Along similar lines, the majority concludes that the long-term video surveillance of the barnyard and pasture areas of Bagshaw's property was not subject to protection under the Fourth Amendment, relying on the open-fields doctrine. The majority argues that the continuous monitoring of the barnyard and pasture areas was reasonable because "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers." *Oliver v. United States*, 466 U.S. 170, 181 (1984).

These cases are not sufficient to reject Bagshaw's Fourth Amendment challenge. Because the intrusion caused by the search in this case was more severe, given its mode, intensity, and duration, than the brief fly-overs and visual inspections condoned in *Oliver* and *Ciraolo*, those cases are distinguishable from the facts presented here. *See United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (distinguishing long-term video surveillance from one-time flyovers on the basis of relative intrusiveness, and stating that "[i]t does not follow that *Ciraolo* authorizes any type of surveillance whatever just because one type of minimally-intrusive aerial observation is possible"). The search of Bagshaw's property through the use of long-term, covert, continuous video surveillance is different from and far more intrusive than the searches held to be reasonable in prior cases.

---

[1] I agree with the majority's analysis dividing Bagshaw's property into the backyard, barnyard, and pasture areas, of which only the backyard constitutes curtilage.

These differences matter, because the proposition that individuals do not have a reasonable expectation of privacy in areas exposed to the public is not without limits—rather, the Supreme Court has considered the intrusiveness of the search when analyzing the bounds of an individual's expectation of privacy. For example, in *Bond v. United States*, 529 U.S. 334 (2000), the Court held that the Fourth Amendment was violated when police officers manipulated a bus passenger's bag in an exploratory manner. The Government had argued that because the passenger knowingly exposed his bag to the public, he "lost a reasonable expectation that his bag would not be physically manipulated." 529 U.S. at 337. This argument relied on the prior Supreme Court precedents in *Ciraolo* and *Riley* "for the proposition that matters open to public observation are not protected by the Fourth Amendment." *Id.* But the Court held that this proposition was not without limitation, and that a search of an object or area exposed to the public could be unreasonable, given its relative intrusiveness. *See id.* (distinguishing earlier cases allowing a search of an area or object exposed to the public because the nature of the search was different in this case: "[p]hysically invasive inspection is simply more intrusive than purely visual inspection"); *see also United States v. Place*, 462 U.S. 696, 707 (1983) (holding that although "a person possesses a privacy interest in the contents of personal luggage," a canine sniff of the bag did not violate the Fourth Amendment because "the manner in which information is obtained through this investigative technique is much less intrusive than a typical search"). *Bond* "reaffirmed the general principle that the nature of the intrusion by the government can have an effect on whether a citizen has a legitimate expectation of privacy." *United States v. Nerber*, 222 F.3d 597, 601 (9th Cir. 2000). These cases stand for the idea

that expectations of privacy with respect to an area or object searched are not all-or-nothing; rather, a person's reasonable expectations of privacy depend on the intrusiveness of the search.

Accordingly, just because society is willing to accept reasonable searches by the government of open fields and curtilage on private property, this does not render nonexistent the constitutional protections against unreasonable searches in those spaces. *Cf. O'Connor v. Ortega*, 480 U.S. 709, 731 (1987) (Scalia, J., concurring) ("Constitutional protection against *unreasonable* searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer."); *Nerber*, 222 F.3d at 601 ("[T]he legitimacy of a citizen's expectation of privacy in a particular place may be affected by the nature of the intrusion that occurs."). Although the public's ability to access information or view a particular area affects the legitimacy of an expectation of privacy, "the threat or possibility of access is not decisive when it comes to the reasonableness of an expectation of privacy." *United States v. Warshak*, 631 F.3d 266, 287 (6th Cir. 2010); *see also United States v. Taketa*, 923 F.2d 665, 673 (9th Cir. 1991) (explaining that "[t]he access of others does not defeat [a person]'s expectation of privacy in his office"). Thus, that a "curious utility worker with a cheap pair of binoculars" could have viewed Bagshaw's backyard, barnyard, and pasture, *see United States v. Anderson-Bagshaw*, No. 1:11–CR–257, 2012 WL 774964, at *2 (N.D. Ohio Mar. 8, 2012), does not necessarily mean that the government had an unfettered, unlimited ability to monitor her every move on her own property for weeks at a time. *See Cuevas-Sanchez*, 821 F.2d at 251. The brief intrusion of the nosy neighbor or the undercover officer is less invasive than prolonged video surveillance; that society is willing to accept the former intrusion as reasonable does not wholly extinguish Bagshaw's reasonable expectation of privacy that

her activities were not being secretly monitored by a hidden camera twenty-four hours a day for several weeks.

"The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Here, the mode of the search (hidden video surveillance), its prolonged duration, and its intensity (the continuous nature of the filming) make it unreasonable. We have recognized that "[v]ideo surveillance in inherently intrusive." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 496 (6th Cir. 2008). We are far from alone in this observation: many other courts have stated that covert video surveillance is a severe intrusion into a person's privacy expectations, which "provokes an immediate negative visceral reaction" and "raises the spectre of the Orwellian state." *Cuevas-Sanchez*, 821 F.2d at 251; *see, e.g.*, *Nerber*, 222 F.3d at 603 ("Hidden video surveillance is one of the most intrusive investigative mechanisms available to law enforcement."); *United States v. Falls*, 34 F.3d 674, 680 (8th Cir. 1994) ("It is clear that silent video surveillance . . . results in a very serious, some say Orwellian, invasion of privacy."); *United States v. Koyomejian*, 970 F.2d 536, 551 (9th Cir. 1992) (Kozinski, J., concurring) ("As every court considering the issue has noted, video surveillance can result in extraordinarily serious intrusions into personal privacy."); *United States v. Mesa-Rincon*, 911 F.2d 1433, 1445 (10th Cir. 1990) (finding video surveillance to be "extremely intrusive"); *United States v. Torres*, 751 F.2d 875, 882 (7th Cir. 1984) (Posner, J.) ("We think it also unarguable that television surveillance is exceedingly intrusive . . . and inherently indiscriminate, and that it could be grossly abused—to eliminate personal privacy as understood in modern Western nations."); *Carter v. Cnty. of L.A.*, 770 F. Supp. 2d 1042, 1050–51 (C.D. Cal. 2011) ("Covert video surveillance is not a traditional tool. . . . Outside of a strip search or a body cavity search, a covert

video search is the most intrusive method of investigation a government employer could select. Secret videotaping goes against the grain of our strong anti-Orwellian traditions."). That Bagshaw was being monitored continuously by a hidden video camera, which could pan and zoom at the will of Agent Morgano from the comfort of Morgano's own home, is deeply troubling, given the Fourth Amendment's role in "guarantee[ing] the privacy, dignity, and security of persons against certain . . . invasive acts by officers of the Government." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 613–14 (1989).

The Government seeks to downplay the severity of its intrusion by arguing that its use of the hidden video camera merely enhanced what would have otherwise been a permissible investigation technique of physical visual surveillance from a publicly available vantage point. *See* Appellee Br. at 29–30; *see also Dow Chem. Co. v. United States*, 476 U.S. 227, 238 (1986) (permitting aerial observation with enhancing camera technology of an industrial complex without a warrant, even though the government used a camera that provided "more detailed information than naked-eye views"). The use of hidden video cameras to aid visual surveillance has been sanctioned by one of our sister circuits on this ground—as a mere improvement in efficiency. *See United States v. Vankesteren*, 553 F.3d 286, 291 (4th Cir. 2009) (considering long-term video surveillance and stating that while the government "could have stationed agents to surveil Vankesteren's property twenty-four hours a day . . . . [t]hat the agents chose to use a more resource-efficient surveillance method does not change our Fourth Amendment analysis").

However, there is more to the issue than merely increased cost-effectiveness—the surreptitiousness of the observation which is enabled through the use of hidden video cameras means

that law-enforcement agents can observe more than they would be able to if they were using physical surveillance. This appears to have been exactly the case in the Bagshaw investigation: the investigators resorted to hidden video cameras because the physical presence of agents on or near Bagshaw's property was too visible. Agent Morgano testified during the suppression hearing that:

> We utilized the worker's compensation analyst in his vehicle up to that point [before the pole camera was installed] conducting surveillance, but given the nature of it being a rural neighborhood and not heavily foot traffic in the businesses, he was very noticeable in his presence. So we opted to remove him from that situation.

R. 57 (Suppression Hearing Tr. at 12:21–13:1) (Page ID #697–98); *see id.* at 41:14–42:1 (Page ID #726–27) (acknowledging that physical surveillance was not undertaken because of a concern that Agent Morgano would be identified and noticed by Bagshaw). In other words, the surreptitiousness of the surveillance is worrisome because "it evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility.'" *United States v. Jones*, 565 U.S. at —, 132 S. Ct. 945, 956 (2012) (Sotomayor, J., concurring) (quoting *Illinois v. Lidster*, 540 U.S. 419, 426 (2004)); *see also* J. Amy Dillard, *Big Brother Is Watching: The Reality Show You Didn't Audition For*, 63 OKLA. L. REV. 461, 498 n.231 (2011) (stating that "[t]echnologically enhanced surveillance does not merely substitute for in-person surveillance" because it makes the presence of the police invisible).

As the increasing technical capacity of the government makes this kind of long-term hidden video surveillance more feasible and readily available, individual privacy becomes threatened.

Courts are often confronted with increasingly intrusive forms of surveillance enabled by technological advancements, and we must carefully consider "what limits there are upon this power of technology to shrink the realm of guaranteed privacy." *Kyllo v. United States*, 533 U.S. 27, 34 (2001); *see also Jones*, 132 S. Ct. at 962–63 (Alito, J., concurring) (explaining the ways in which technological progress may influence privacy expectations); *United States v. Garcia*, 474 F.3d 994, 998 (7th Cir. 2007) ("Technological progress poses a threat to privacy by enabling an extent of surveillance that in earlier times would have been prohibitively expensive."). We recently recognized in *Warshak* that "the Fourth Amendment must keep pace with the inexorable march of technological progress, or its guarantees will wither and perish." *Warshak*, 631 F.3d at 285. Thus, we must carefully consider the ways in which the government's capacity to monitor continuously and surreptitiously an individual's behavior through hidden video surveillance—without a warrant—may impinge on the privacy and dignity guaranteed by the Fourth Amendment.

As the majority points out, five Justices of the Supreme Court recently indicated in *Jones* that there may be constitutional concerns with long-term warrantless surveillance of individuals. *See Jones*, 132 S. Ct. at 964 (Alito, J., concurring) ("[S]ociety's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period."); *id.* at 955 (Sotomayor, J., concurring) (agreeing with Justice Alito that long-term GPS monitoring offends expectations of privacy). These concerns are founded upon a recognition that long-term monitoring enables the government to obtain a different set of information than a single visual observation of an area. *Cf. id.* at 955 (Sotomayor, J., concurring) ("GPS monitoring generates a precise,

comprehensive record of a person's public movements that reflects a wealth of detail about her

familial, political, professional, religious, and sexual associations."). This makes long-term

surveillance more intrusive than a fly-over or transitory visual observation. *See id.* at 956

("Awareness that the Government may be watching chills associational and expressive freedoms.

And the Government's unrestrained power to assemble data that reveal private aspects of identity

is susceptible to abuse."); Daniel J. Solove, *Conceptualizing Privacy*, 90 Cal. L. Rev. 1087,

1130–31 (2002) ("Being watched can destroy a person's peace of mind, increase her self-

consciousness and uneasiness to a debilitating degree, and can inhibit her daily activities. . . . An

important dimension of privacy is informational control, which does not readily translate into spatial

terms."); *cf. United States v. White*, 401 U.S. 745, 787 (1971) (Harlan, J., dissenting) ("Authority is

hardly required to support the proposition that words would be measured a good deal more carefully

and communication inhibited if one suspected his conversations were being transmitted and

transcribed. Were third-party bugging a prevalent practice, it might well smother that

spontenaneity—reflected in frivolous, impetuous, sacrilegious, and defiant discourse—that liberates

daily life.").

In *United States v. Oliver*, 686 F.2d 356 (6th Cir. 1982) (en banc), *aff'd*, 466 U.S. 170 (1984),

even as we robustly affirmed the open-fields doctrine, we maintained that the Fourth Amendment

"would protect a person in an open field." 686 F.2d at 360. This makes sense, because the Fourth

Amendment "protects people, not places." *Katz*, 389 U.S. at 351. We explained that the Fourth

Amendment principles articulated by courts protect privacy by "establish[ing] an environment in

which individual emotional and mental processes can develop freely *without surveillance or*

*interference.*" *Oliver*, 686 F.2d at 360 (emphasis added). This important freedom is threatened by the severely intrusive tactics used to monitor continuously Bagshaw's activities on her residential property—warrantless, long-term secret video surveillance. Bagshaw's expectation that she would not be monitored continuously on her own property is reasonable. In sum, I would hold that the video surveillance obtained using the pole camera in this case was an unreasonable search which violated Bagshaw's Fourth Amendment rights.

## II. HARMLESS ERROR

The next question that we must address is whether the constitutional violation was harmless such that reversal of the convictions is not required. When evidence obtained in violation of the Fourth Amendment is admitted improperly, reversal is required "[i]f there is a reasonable probability that the evidence complained of contributed to the conviction." *United States v. Carnes*, 309 F.3d 950, 963 (6th Cir. 2002); *see Chapman v. California*, 386 U.S. 18, 22–24 (1967). "'To determine whether the error was harmless under *Chapman* the question this court must ask is whether, absent the improperly admitted [evidence], it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty.'" *Carnes*, 309 F.3d at 963 (quoting *United States v. Wolf*, 879 F.2d 1320, 1324 (6th Cir. 1989)).

The jury was shown twelve minutes and forty-six seconds of footage from the pole camera.[2] This footage contained clips showing Bagshaw raking, mowing the pasture area, pulling a wagon, pushing a wheelbarrow, bending, squatting, picking up small objects, carrying bags, moving a hose, and bending over to care for an alpaca, among other things. I consider this evidence alongside the other evidence presented at trial as it relates to each count for which the pole-camera footage might have been relevant.[3] "In determining whether an error is harmless, the reviewing court must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened." *United States v. Pugh*, 405 F.3d 390, 400 (6th Cir. 2005) (internal quotation marks omitted).

*Counts 1 through 6.* Count 1 charged Bagshaw with devising a scheme to defraud the government which involved an alleged "fail[ure] to reveal her ability to work and her work activities" as well as alleged misrepresentations with respect to her medical condition. R. 3 (Indict.

---

[2]Because I would hold that the entirety of the pole-camera footage was obtained in violation of the Fourth Amendment, I consider the relative harmlessness of all of the pole-camera clips shown to the jury. This is unlike the majority, which considers only the clips of the backyard area in its harmlessness analysis. Additionally, although Bagshaw urges the court to suppress "the warrantless pole camera surveillance and all fruits of this illegal search and seizure," *see* Appellant Br. at 18, Bagshaw does not appear to make the argument that all evidence obtained from the search of her home—which occurred after the police obtained a search warrant—also should be suppressed. Because Bagshaw does not make this argument, I do not consider whether the evidence obtained during the execution of the search warrant was fruit of the poisonous tree that should also be suppressed.

[3]I exclude Counts 10, 11, 12, and 13 from this analysis because the pole-camera footage was not relevant to demonstrating allegedly false statements relating to income Bagshaw received from business or investment activities, Bagshaw's volunteer activities at alpaca and fleece shows, Bagshaw's driving in relation to the alpaca business, or Bagshaw's travel outside of Ohio.

at 2–3) (Page ID #9–10).  Counts 2 through 5 charged Bagshaw with making false statements on various EN-1032 forms, in which Bagshaw allegedly "failed to disclose the extent of her work activities."  R. 3 (Indict. at 4–5) (Page ID #11–12).  Count 6 charged Bagshaw with "conceal[ing] her true medical condition and physical abilities from Dr. Amardeep Chauhan."  R. 3 (Indict. at 6) (Page ID #13).  These counts focus on alleged false statements made in connection with (i) Bagshaw's medical condition, and (ii) Bagshaw's work activities.

Regarding alleged misrepresentations with respect to Bagshaw's medical condition or physical capabilities, the pole-camera footage largely duplicated other video evidence presented at trial.  Although the pole-camera footage showed Bagshaw's ability to bend over, squat, twist, and carry heavy objects, the cruise footage and the home videos also displayed these abilities.  Bagshaw is seen pulling a heavy suitcase in the cruise footage, and she is seen bending, squatting, and twisting in both the cruise footage and the home videos.  Even if the jury had not been shown the improper surveillance clips, given the other damaging video evidence demonstrating Bagshaw's physical abilities, it is clear beyond a reasonable doubt that a jury would have returned a verdict of guilty on these counts.

Similarly, regarding misrepresentations relating to the extent of Bagshaw's work activities, the pole-camera footage was duplicative of other video footage presented to the jury, as well as testimony from Ensie Pinchak.  The home videos were particularly harmful to the defense, because they demonstrate Bagshaw's active involvement with the alpaca farm.  Further, there was testimony from Pinchak regarding Bagshaw's activities relating to the farm.  *See* R. 139 (Trial Tr. at 975–78)

(Page ID #2720–23).  Given this other evidence, as to Counts 1 through 6, the pole-camera footage was harmless.

*Count 7.*  Count 7 charged Bagshaw with falsely stating that her "back pain, it consumes my brain and . . . I can't focus on things 'since' the pain just always like interferes," when Bagshaw allegedly "was able to focus on matters related to the promotion and operation of a farm, taking classes and seminars, . . . functioning during local and extended business and pleasure trips, and performing physical labor at her residence/farm." R. 3 (Indict. at 6) (Page ID #13).  The pole-camera footage demonstrated Bagshaw's general ability to perform maintenance on her property, including mowing the lawn and raking leaves, as well as her ability to bend and lift objects with no signs of physical pain.  To the extent that the footage showed that Bagshaw could conduct routine activities without showing signs of pain, this evidence was duplicated by other video evidence which showed Bagshaw raking leaves, pulling suitcases, bending, twisting, and showing alpacas at shows.  The pole-camera footage was thus harmless with respect to Count 7.

*Count 8.*  Count 8 charged Bagshaw with falsely stating that "[her] husband . . . takes care of the alpacas and runs the business" when Bagshaw allegedly "engaged in substantial activities related to the operation" of the alpaca farm.  R. 3 (Indict. at 7) (Page ID #14).  Because the majority of the pole-camera footage showed Bagshaw raking, mowing, and picking up objects around the pasture area, the footage was directly relevant to Count 8.  However, there was other robust video evidence that Bagshaw was involved in the alpaca farm, including physically caring for the animals, assisting with the shearing of alpacas, and showing alpacas at shows.  Further, as outlined above, there was witness testimony indicating that Bagshaw was involved with the alpaca farm, including

maintenance of the farm and transporting animals for veterinary care. Thus, there was no reasonable probability that the pole-camera footage contributed to the conviction on Count 8. *See Carnes*, 309 F.3d at 963.

*Count 9.* Count 9 charged Bagshaw with making a false statement when she answered "No" in response to the question, "You're not doing anything to physically care for the . . . animals?" R. 3 (Indict. at 8) (Page ID #15). The pole-camera footage shown to the jury contained four segments showing Bagshaw either chasing after the alpacas or bending over the alpacas to care for them. The jury was also shown the home videos, which contained footage of Bagshaw helping feed the animals, caring for newborn alpacas, chasing the alpacas, and assisting with shearing the alpacas. Additionally, Pinchak testified that she saw Bagshaw working with the animals and feeding the animals two to three times a day. *See* R. 139 (Trial Tr. at 975–77) (Page ID #2720–22). Given the direct video evidence in the home videos that showed Bagshaw physically caring for the animals and Pinchak's testimony, the additional four segments contained in the pole-camera videos were harmless with respect to Count 9.

*Count 14.* Count 14 charged Bagshaw with making a false statement when she answered "No" in response to the question, "Do you think you could work limited duty or limited hours?" R. 3 (Indict. at 11) (Page ID #18). Similar to Count 7, to the extent the pole-camera footage showed Bagshaw's general ability to perform daily activities, this evidence was duplicated by the other video evidence presented to the jury, as well as by the testimony of Pinchak. Given the cumulative nature of the video evidence, the pole-camera footage was harmless with respect to Count 14.

Accordingly, I concur with the majority that the admission of the pole-camera footage was harmless error.

### III. MULTIPLICITOUS COUNTS

I concur in the majority's holding that Count 4 and Counts 7 through 14 are not muliplicitous, because each involves proof of a different factual predicate. *See United States v. Dedman*, 527 F.3d 577, 600 n.10 (6th Cir. 2008) ("Separate allegedly false statements . . . are not mere multiple factual predicates but rather are entirely separate offenses." (internal quotation marks omitted)); *United States v. Berardi*, 629 F.2d 723, 729 (2d Cir. 1980). However, I note that during the December 10, 2008 interview, when the allegedly false statements in Counts 7 through 14 were made, Agent Dancer posed well over one-hundred questions to Bagshaw, many of which were aimed at only a few aspects of the investigation—discovering the extent of Bagshaw's physical capabilities, and discovering the extent of her activities relating to the alpaca farm. *See* Gov't Ex. 12A. A different conclusion may have been warranted if the indictment had charged Bagshaw with multiple counts of making essentially the same false statement in responding to rephrased questions that aimed at a single aspect of the investigation. *See Gebhard v. United States*, 422 F.2d 281, 289–90 (9th Cir. 1970) ("[W]e do not think it proper that the government bludgeon a witness who is lying by repeating and rephrasing the same question, thus creating more possible perjury counts."); *United States v. Clarridge*, 811 F. Supp. 697, 705 (D.D.C. 1992) (holding that artificial multiplication of charges is improper, and that "[s]eparate counts are only appropriate where the 'inquiries [are] directed to a separate facet of the overall transaction being investigated'" (quoting *United States v.*

*Doulin*, 538 F.2d 466, 471 (2d Cir. 1976))); *see also United States v. Ragland*, 3 F. App'x 279, 284

(6th Cir. 2001).

For the foregoing reasons, I concur in the judgment.