SUPERIOR COURT 
 
 COMMONWEALTH VS. RAMON CRUZ-GONZALEZ and ISRAEL SANTIAGO ORTIZ

 
 Docket:
 1977CR00467 / 1977CR00469
 
 
 Dates:
 November 30, 2020
 
 
 Present:
 /s/Jeffrey T. Karp Associate Justice, Superior Court
 
 
 County:
 ESSEX, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON RAMON CRUZ-GONZALEZ'S MOTION TO SUPPRESS POLE CAMERA EVIDENCE (Paper No. 13 in No. 1977CR00467) AND ISRAEL SANTIAGO ORTIZ'S MOTION TO SUPPRESS POLE CAMERA EVIDENCE (Paper No. 22 in No. 1977CR00469)
 
 

             On August 6, 2020, the Supreme Judicial Court ruled in Commonwealth v. Mora, 485 Mass. 360 (2020), for the first time that the surveillance of a person's residence by police for more than two months by use of a pole camera is a "search" under Article 14 of the Massachusetts Declaration of Rights and, prospectively, requires a search warrant. Id. at 376. In this case, the parties ask the Court to determine if the surveillance of three residences by police using pole and car cameras for at least 23 days is a "search" under Article 14 and, if so, whether the Commonwealth met its burden under Mora to establish that the officers had probable cause when they installed each of the cameras.
            As the result of a long-term investigation by police of a sophisticated drug trafficking organization that allegedly operated in Lawrence and Methuen, the Commonwealth obtained indictments against defendants Ramon Cruz-Gonzalez ("Cruz-Gonzalez") and Israel Santiago Ortiz ("Santiago Ortiz"), and fifteen other members of
                                                            Page 1 of 24
the alleged drug trafficking organization. Cruz-Gonzalez and Santiago Ortiz are charged with drug trafficking and firearms offenses arising from the long-term police investigation. They have each moved to suppress evidence generated from pole and car cameras used by police to surveil two homes in Lawrence, located at 47 Exchange St. and 2 Railroad St., and a home in Methuen, located at 96 Boston Street. More specifically, Cruz-Gonzalez and Santiago Ortiz seek to suppress the camera footage and police observations thereof, which the police used to obtain search warrants for the three homes.
            On November 10, 2020, the Court conducted an evidentiary hearing on Cruz-Gonzalez's Supplemental Memorandum Of Law In Response To The Court's Procedural Order No. 1 (Paper No. 13 in No. 1977CR00467) ("RCG Motion") and Santiago Ortiz's Motion To Reconsider Denial Of Defendant's Motion To Suppress After Commonwealth v. Mora (Paper No. 22 in No. 1977CR00469) ("ISO Motion"), which the Court is treating as motions to suppress pole (and car) camera evidence.[1]
---------------------------
[1]Some information about the procedural background of these two cases is appropriate to explain the titles of the RCG Motion and the ISO Motion.
The Regional Administrative Justice specially assigned this Court (i.e., the undersigned judge) to handle pretrial proceedings involving the two defendants here and their fifteen codefendants. Pursuant to that authority, on July 27, 2020, the Court conducted a nonevidentiary hearing on Santiago Ortiz's Motion To Suppress Evidence (Paper No. 14 in No. 1977CR00469), in which he sought to suppress evidence seized by the police pursuant to a search warrant at 96 Boston Street. Further, on September 14, 2020, the Court conducted a nonevidentiary hearing on Cruz Gonzalez's Motion To Suppress Evidence (Paper No. 7 in No. 1977CR00467), in which he sought to suppress evidence seized by the police pursuant to search warrants at 47 Exchange St. and 2 Railroad Street. Those motions to suppress evidence were filed prior to the SJC's decision in Mora. The police used observations they made via the pole (and car) cameras in their applications for the search warrants.
The Court denied the motions to suppress evidence obtained via the search warrants, but granted Cruz-Gonzalez and Santiago Ortiz leave to seek suppression of evidence derived from the pole camera surveillance pursuant to Mora. See endorsement order at Paper No. 14 in No. 1977CR00469 and the Memorandum of Decision and Order at Paper No. 15 in No. 1977CR00467.
                                                            Page 2 of 24
            The Court received one exhibit in evidence: the (supplemental) Affidavit of Robert C. Noonan ("Supplemental Affidavit").
            As is fully explained below, after thorough consideration of the Supplemental Affidavit, the parties' submissions, and arguments of counsel, the RCG Motion and the ISO Motion are DENIED.
FINDINGS OF FACT
            The Court makes the following findings from the facts set forth in the Supplemental Affidavit and reasonable inferences drawn therefrom.[2]
            1. Overview Of Investigation 
            In spring 2017, Trooper Robert Noonan ("Noonan") and Sgt. Daniel Clemens ("Clemens") of the Massachusetts State Police ("MSP"), and other investigators began investigating a narcotics distribution network in the Lawrence area. The initial target of the investigation was Robinson Adames Abreu ("Adames Abreu"), who investigators suspected was selling fentanyl, heroin, and cocaine in the Lawrence area. Investigators learned cellular telephone numbers used by Adames Abreu and identified "runners" he used to deliver narcotics to buyers.
            Clemens eventually arranged and conducted eleven undercover purchases of narcotics from Adames Abreu and his runners. Investigators learned two locations they suspected Adames Abreu used to distribute and store ("stash") drugs: an auto body garage located at 333 Methuen St., Lawrence ("Garage") and an apartment at 46 — 48 Cypress Ave., Methuen.
---------------------------
[2] The Court sets forth additional findings of facts in the Conclusions of Law section, infra.
                                                            Page 3 of 24
            2. Continuing Investigation And Initial Wiretap Warrants 
            On March 25, 2019, investigators obtained an order from a Superior Court judge ("Judge")[3] that authorized the interception of communications over a cellular telephone number (i.e., a "wiretap warrant") used by Adames Abreu. Immediately thereafter, investigators intercepted communications during which Adames Abreu engaged in the distribution of narcotics.[4]
            Through the intercepted communications, investigators quickly identified Alberto Santana ("Santana") as one of Adames Abreu's narcotics suppliers. For example, on March 26, 2019, investigators intercepted communications between Santana and Adames Abreu during which Adames Abreu requested additional time to pay Santana money for a previous narcotics purchase, and Santana told Adames Abreu that he (Santana) needed additional time to obtain more narcotics to resupply Adames Abreu.
            On April 8, 2019, the Judge renewed the wiretap warrant for Adames Abreu's telephone number, and authorized wiretap warrants for a cellular telephone number used by Santana and another number used by Adames Abreu.
3. Alberto Santana & Jocheiry Acevedo-Hernandez Are Identified As  Members Of DTO 
            In late March and April 2019, investigators reasonably determined from intercepted communications that Santana was a member of a highly organized, sophisticated drug trafficking organization ("DTO") and that Santana's source of the narcotics he sold to Adames Abreu came from members of the DTO. Officers also
---------------------------
[3] The same Superior Court judge (Lang, J.) authorized all of the search warrants and wiretap warrants obtained by police during the investigation.
[4] The Supplemental Affidavit contains excerpts from transcripts of numerous communications intercepted by police pursuant to several wiretap warrants.
                                                            Page 4 of 24
learned at this time that Santana collected money from Adamas Abreu on behalf of the DTO.
            In April and May 2019, investigators intercepted communications during which Santana arranged the purchase and sale of narcotics, and regularly coordinated drug distribution activities, with Jocheiry Acevedo-Hernandez ("Acevedo-Hernandez") and Nelson Galan ("Galan"), who investigators identified as members of the DTO.
            Officers learned that Acevedo-Hernandez and Galan used separate units in an apartment building located at 572 — 574 Essex St., Lawrence ("Building") to conduct their drug trafficking activities.[5] By mid-May 2019, officers determined that the DTO used three apartments inside the Building as its operational center.
            4. Ramon Cruz Gonzalez Identified As High Ranking Member Of DTO  In early May 2019, officers began to use pole and car cameras to surveil locations, not at issue here, associated with the DTO.
            Moreover, in early May 2019, officers learned from intercepted communications that Acevedo-Hernandez played a significant role in the DTO, especially as a narcotics "mixer," and that he mixed and package narcotics inside an apartment in the Building. Officers heard numerous conversations between Acevedo-Hernandez and Santana during which Santana requested Acevedo-Hernandez to package specific quantities of narcotics for sale (e.g., "six and a half on one and 500 in the other"). Officers observed Santana engage in conduct that reasonably led them to believe that he brought narcotics to and from Acevedo-Hernandez at the Building for mixing and packaging for sale.
---------------------------
[5] The Building contains commercial and retail space on the bottom floor, including a barbershop.
                                                            Page 5 of 24
            During conversations intercepted by police in early May 2019, Acevedo-Hernandez and Santana spoke of "Ramon," later identified as Cruz-Gonzalez, as being the source of money used to procure narcotics for DTO distribution efforts.
            On May 6, 2019, the Judge renewed authorization to continue to intercept communications over telephone numbers used by Santana and Adames Abreu, and authorized wiretap warrants for telephone numbers used by Acevedo-Hernandez and Galan during previously intercepted DTO communications. Thereafter, beginning May 7, 2019, officers intercepted communications by Acevedo-Hernandez and Galan during which they coordinated drug trafficking activities among suspected members of the DTO and drug buyers.
            Also on May 6, 2019, investigators intercepted communications between Acevedo-Hernandez and Santana in which Acevedo-Hernandez told Santana, "Ramon needs one." Shortly thereafter, officers observed Santana travel to a "stash" location, enter and quickly exit that location carrying a black bag, arrive at the Building, and ask Acevedo-Hernandez to let him in the Building. Acevedo-Hernandez told Santana to call "Ramon" at the barbershop (located in the bottom of the Building) and then directed Santana to go to the sixth floor of the Building.
            The following day (May 7), Santana contacted Acevedo-Hernandez and coordinated payment for the previous day's drug transaction. Acevedo-Hernandez told Santana to go to the second floor of the Building. Shortly thereafter, investigators observed Santana exit the Building and drive away.
                                                            Page 6 of 24
            In addition, on May 10, 12, and 14, 2019, officers intercepted Cruz-Gonzalez directing Acevedo-Hernandez about the mixing (i.e., "cutting"), testing, potency (purity), packaging, and storage of narcotics.
            On May 17, 2019, officers intercepted a call received by Galan from Michael Figueroa ("Figueroa") during which Figueroa ordered a "thirty" (i.e., a kilo of cocaine for $30,000), and coordinated the time and place of the transaction. Galan commented that the time chosen for the drug exchange was good because it would be during a police shift change. On May 18, Figueroa and Galan confirmed the time of the drug transaction and Galan told him to take the elevator to the third floor when he arrived at the Building for the transaction. Later that day, investigators observed Figueroa arrive at, and enter, the Building at the allotted time. Investigators further observed Figueroa exit the Building and drive away. Officers stopped Figueroa's vehicle and seized a kilogram of cocaine.
            By mid-May 2019, investigators reasonably believed that Cruz-Gonzalez was a leader of the DTO.[6] Further, by May 20, 2019, investigators reasonably believed that a man Cruz-Gonzalez and others referred to as "Simpson," who police later identified as Santiago Ortiz, handled the DTO's bookkeeping and finances at Cruz-Gonzalez's direction.
---------------------------
[6] On May 30, 2019, police intercepted communications during which a DTO member spoke deferentially to Ramon, and referred to him as "jefe" and "boss." On the same date, Galan referred to Cruz-Gonzalez as "patron," which Noonan believed means "boss" or "employer" in Spanish.
                                                           Page 7 of 24
            On May 21, 2019, the Judge authorized the collection of "ping" location data from Cruz-Gonzalez's telephone number.[7]
            On May 24, 2019, at 3:09 p.m., officers intercepted Acevedo-Hernandez complain to Santiago Ortiz that Galan was selling narcotics directly from the Building. Acevedo-Hernandez expressed concern that Cruz-Gonzalez ("Ramon") would get upset if the landlord evicted Acevedo-Hernandez and Galan from the Building. Santiago Ortiz told Acevedo-Hernandez that Cruz-Gonzalez would address the situation soon.
            On May 29, 2019, the Judge authorized a wiretap warrant for a cellular telephone number used by Cruz-Gonzalez and police began intercepting his communications.
            On May 30, 2019, investigators intercepted Santiago Ortiz and Cruz-Gonzalez discussing DTO finances. Santiago Ortiz complained he was "short" $1,000 or more according to his records, and that the DTO made "a mistake" regarding one of the "bricks." Cruz-Gonzalez replied that they needed to increase their inventory. As explained further below, during these communications, Cruz-Gonzalez and Santiago Ortiz exchanged images of electronic drug ledgers (i.e., spreadsheets).
            On May 30, 2019, Cruz-Gonzalez told "Melvin," a DTO member, that they needed to discuss increasing the narcotics inventory and he directed "Melvin" to bring money to him at the Building.
---------------------------
[7]A "ping" is a signal sent to a cellular telephone from a cellular tower or a mobile device capable of broadcasting a cellular signal, which allows officers to obtain cellular site location information ("CSLI") in "real time." See Commonwealth v. Fredericq, 482 Mass. 70, 77 — 78 (2019) (explaining that "CSLI monitoring of the cellular telephone tracked the defendant's location when he was in the vehicle in much the same way as would GPS tracking of that vehicle.").
                                                            Page 8 of 24
            By May 31, 2019, officers had intercepted Cruz-Gonzalez directing Santiago Ortiz (aka "Simpson") about financial matters and the amount of inventory of narcotics they should have on hand. Officers had also observed them together at the Building.
            5. 96 Boston St., Methuen, MA 
            On May 22, 2019, Cruz-Gonzalez's cell phone "pinged" at 96 Boston St. at 1:38 a.m. and numerous times thereafter until 11:50 p.m.
            On May 23, 2019, Cruz-Gonzalez's cell phone "pinged" at 96 Boston St. at 12:05 a.m. and several times thereafter until 1:26 p.m., and later that day between 5:53 p.m. and 11:06 p.m.
            On May 24, 2019, Cruz-Gonzalez's cell phone "pinged" at 96 Boston St. at 12:09 a.m. and at other times on that date until 1:32 p.m. Thus, by the late morning hours of May 24, investigators reasonably believed that Cruz-Gonzalez frequently stayed overnight and/or resided at 96 Boston St.
            On May 24, 2019, at 2:20 p.m. officers deployed a car camera on Boston Street.[8] From that camera, which the police removed on June 2, 2019,[9] officers made observations of 96 Boston St. through the live video feed and video recordings.[10]
---------------------------
[8]A car camera is a camera installed in a police vehicle that streams and records video images. Here, the car cameras used by the investigators in the areas of 96 Boston St. and 47 Exchange St. did not capture any sound and did not have night vision capability. Officers were able to watch the video in "real time" (i.e., "live"). During the "live" feed, officers could remotely change the viewing angle of the camera and zoom in on things. The car cameras also recorded the video images, but officers had no ability to change the viewing angle of the camera or zoom in on things.
[9] The Supplemental Affidavit does not state the date upon which the police removed the car camera; however, at the hearing, the Commonwealth represented that the police removed the camera on June 2.
[10] Cruz-Gonzalez's cell phone also pinged in the area of 96 Boston St. during the early and late morning hours of May 25 — 29, 2019. Moreover, on May 29 at 3:10 p.m. officers observed (via the car camera), Santiago Ortiz walk from the driveway at 96 Boston St., enter Cruz-Gonzalez's vehicle, and drive away.
                                                            Page 9 of 24
            On May 29, 2019, officers installed a pole camera on a utility pole on Boston St. and aimed it at 96 Boston St.[11][12]
            On June 26, 2019, officers removed the pole camera.[13] Thus, the police conducted continuous video surveillance of 96 Boston St. via the car and pole cameras for 34 days (i.e., May 24 at 2:20 p.m. to June 26, 2019).
            6. 2 Railroad St., Lawrence, MA 
            Using CSLI from Cruz-Gonzalez's cell phone, police determined he was at 2 Railroad Street on May 30, 2019, at 9:45 p.m. and that Santiago Ortiz joined him at that location shortly thereafter. Police then intercepted numerous texts messages exchanged by Santiago Ortiz and Cruz-Gonzalez while they were at 2 Railroad St. that included several images of drug transaction ledgers (i.e., spreadsheets). While still at that location, Cruz-Gonzalez communicated with Acevedo-Hernandez and provided "mixing" instructions for narcotics.
            On May 31, 2019, at 6:15 p.m., police intercepted a communication during which Cruz-Gonzalez, while at 2 Railroad St., told Santiago Ortiz that he had been sleeping.
---------------------------
[11] A pole camera is a camera installed by police on a utility pole. Here, like the car cameras, the pole cameras used by police near the three subject addresses did not capture any sound and did not have night vision capability. Officers were able to watch the video in "real time" (i.e., "live"). During the "live" feed, officers could remotely change the viewing angle of the camera and zoom in on things. The pole cameras also recorded the video images, but officers had no ability to change the viewing angle of the camera or zoom in on things.
[12] The Supplemental Affidavit does not state the time at which the police installed the pole camera near 96 Boston Street. Thus, for purposes of its analysis, the Court will assume that police installed the pole camera at 12:01 a.m. on May 29, 2019.
[13] The Supplemental Affidavit does not state the date upon which the police removed the pole camera; however, at the hearing, the Commonwealth represented that the police removed the camera on June 26.
                                                            Page 10 of 24
Later that evening while still at the same location, Cruz-Gonzalez told Santiago Ortiz that he had addressed an issue with a rival narcotics distributor and he asked Santiago Ortiz whether another member of the DTO had brought Santiago Ortiz money.
            During the early morning hours of June 1, 2019, while still at 2 Railroad St., Cruz-Gonzalez received a text message from Santiago Ortiz in which Santiago Ortiz provided the amounts and sources of proceeds from sales of narcotics.
            On June 4, 2019, police installed a pole camera on a utility pole and pointed it at 2 Railroad Street.[14]
            On June 26, 2019, officers removed the pole camera.[15] Thus, the police conducted continuous video surveillance of 2 Railroad St. via the pole camera for 23 days (i.e., June 4 at 12:01 a.m. to June 26, 2019).
            8. 47 Exchange St., Lawrence, MA
            Using CSLI, police determined that Cruz-Gonzalez's cell phone was at 47 Exchange St. during the early and late morning hours of May 31, 2019.
On June 1, 2019, CSLI showed that Cruz-Gonzalez's cell phone was at 47 Exchange St. from 1:48 a.m. until 11:55 a.m. Thus, by the late morning hours on June 1 police reasonably concluded that Cruz-Gonzalez stayed overnight at 47 Exchange St. on May 31 and June 1.
---------------------------
[14] The Supplemental Affidavit states that police installed the pole camera near 2 Railroad St. on June 4 and began "using" it on June 5 at approximately 2:45 p.m. However, the Supplemental Affidavit does not state the time at which the police installed the pole camera. Thus, for purposes of its analysis, the Court will assume that police installed the pole camera at 12:01 a.m. on June 4, 2019.
[15] At the hearing, the Commonwealth represented that the police removed the camera on June 26.
                                                            Page 11 of 24
            On June 1, 2019, at 12:40 p.m., police deployed a car camera in the area of 47 Exchange St. and removed it on June 6, 2019.[16]
            On June 4, 2019, police installed a pole camera on a utility pole and pointed it at 47 Exchange Street.[17]
            On June 26, 2019, officers removed the pole camera.[18] Thus, the police conducted continuous video surveillance of 47 Exchange St. via the car and pole cameras for 26 days (i.e., June 1 at 12:40 p.m. to June 26, 2019).
CONCLUSIONS OF LAW 
            As stated, Cruz-Gonzalez and Santiago Ortiz seek the suppression of all observations made by police from the pole and car cameras and the video footage. They argue that surveillance conducted by police using the cameras was a search in the constitutional sense and that the Commonwealth failed to meet its burden under Mora to establish "that investigators had probable cause when each of the pole cameras was installed, and thus were not acting in a wholly arbitrary manner." Mora, 485 Mass. at 377.
---------------------------
[16] At the hearing, the Commonwealth represented that the police removed the car camera on June 6.
[17] The Supplemental Affidavit states that police installed the pole camera near 47 Exchange St. on June 4 and began "using" it on June 5 at approximately 2:45 p.m. However, the Supplemental Affidavit does not state the time at which the police installed the pole camera. Thus, for purposes of its analysis, the Court will assume that police installed the pole camera at 12:01 a.m. on June 4, 2019.
[18] At the hearing, the Commonwealth represented that the police removed the camera on June 26.
                                                            Page 12 of 24
            For its part, the Commonwealth argues that, unlike the two months of surveillance in Mora, the surveillance here, which was no longer than 34 days, was not a search in the constitutional sense. The Commonwealth further argues that, if the Court concludes that the surveillance was a search, it met its burden under Mora to establish the officers had sufficient probable cause when they installed each of the cameras.
            As stated below, the Court agrees with the defendants that the continuous video surveillance at each of the three residences were searches under Article 14. However, the Court agrees with the Commonwealth that it met its burden under the Mora standard to justify the surveillance.
            A. THE LEGAL FRAMEWORK
            "Article 14 like the Fourth Amendment to the United States Constitution, guarantees 'a right to be secure from all unreasonable searches ... and seizures." Commonwealth v. Buckley, 478 Mass. 861, 865 (2018). Therefore, the initial question before the Court is "whether any of the surveillance in this case was a 'search' in the constitutional sense." Mora, 485 Mass. at 364 (citation omitted).
            "'Under both the Federal and Massachusetts Constitutions, a search in the constitutional sense occurs when the government's conduct intrudes on a person's reasonable expectation of privacy." Id. (citation omitted). "To show that the use of pole [and car] cameras in this case was a 'search' under art. 14, the defendants bear the burden of establishing that (1) they 'manifested a subjective expectation of privacy in the object of the search,' and (2) 'society is willing to recognize that expectation as reasonable." Id. at 366 (citations omitted).
                                                            Page 13 of 24
            The SJC ruled in Mora that two of the three defendants before it met their burden under Article 14 to establish that "they manifested a subjective expectation of privacy in the aggregate of their activities captured by the security cameras" by "fil[ing] affidavits in which they stated that they did not expect to be surveilled coming and going from their homes over an extended period.” [19] Id. at 366. The SJC further ruled that the two defendants' expectation of privacy in their comings and goings from their homes for more than two months "is one that society would regard as 'reasonable,' justifiable,' or 'legitimate." Id. at 368 (citation omitted). Hence, the SJC held that the continuous police surveillance by use of a pole camera of a "residence[] for more than two months [i]s a `search' under art. 14" and police must obtain a search warrant.[20] Id. at 376.
            In announcing the "new rule" in Mora requiring a search warrant for police surveillance of a residence for more than two months, the SJC recognized "that police departments across the country have used pole cameras, without the need for a warrant, for at least three decades." Id. (citations omitted). Therefore, the SJC ruled that:
On remand, the motion judge, at an appropriate hearing, must consider whether, at the time the pole camera surveillance began, the Commonwealth had "probable cause to believe [(1)] that a particularly described offense has been, is being, or is about to be committed, and [(2)] that [the pole camera] will produce
---------------------------
[19] With respect to the third defendant in Mora, the SJC ruled he "presented no direct evidence that he manifested a subjective expectation of privacy" because, "[a]lthough he filed an affidavit in support of his motion to suppress, he did not explicitly state within it that he expected his movements to go unobserved." Id. at 366.
[20] The SJC in Mora relied solely on Article 14 and did not reach the question of whether the pole camera surveillance was a "search" under the Fourth Amendment. Id. at 361. In this case, the defendants do not argue that the Fourth Amendment is more protective than Article 14. Nevertheless, our appellate courts likely would not credit such an argument. See e.g., Commonwealth v. Upton, 394 Mass. 363, 373 (1985) ("art. 14 provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause" to obtain a search warrant).
                                                           Page 14 of 24
evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense." . . [At the hearing, the Commonwealth] may be able to establish probable cause through affidavits submitted in support of warrants it [] obtain[ed] during the course of the investigation, such as for wiretaps. Alternatively, the Commonwealth may meet its burden through supplemental affidavits and other relevant evidence it may seek to proffer at a new evidentiary hearing. If the Commonwealth can show that investigators had probable cause when each of the pole cameras was installed, and thus were not acting in a wholly arbitrary manner, the motions to suppress should be denied in their entirety.
Id. at 377 (internal quotations and citation omitted) (emphasis added).
            Therefore, if the defendants in this case establish that the video surveillance was a search under Article 14, the burden shifts to the Commonwealth to establish the following two prongs of the Mora standard: that, before installing the cameras, the Commonwealth had probable cause to believe: (1) that a crime had been committed; and, (2) that the cameras will produce evidence of that crime or will aid in the apprehension of a person that is shown to have committed that crime.
            With this framework in mind, the Court will address the propriety of the pole and car camera surveillance at issue here.
                                                            Page 15 of 24
B. THE POLE AND CAR CAMERA SURVEILLANCE OF THE THREE  RESIDENCES WERE SEARCHES IN THE CONSTITUTIONAL SENSE  UNDER ARTICLE 14 
            As stated, the police installed pole and car cameras and continuously surveilled the three residences for between 23 and 34 days.[21] [22]
            In order to determine whether a search under Article 14 occurred the Court must first address whether the defendants have met their burden to prove that they "'manifested a subjective expectation of privacy'" in their comings and goings to and from the three residences at issue during the applicable time periods. Mora, 485 Mass. at 368 (citation omitted). Here, like two of the three defendants in Mora, the defendants "manifested a subjective expectation of privacy in the aggregate of their activities captured by the security cameras" by "filling] affidavits in which they stated that they did not expect to be surveilled coming and going from their homes over an extended period."[23] Id. at 366.
---------------------------
[21] As stated, the police conducted continuous camera surveillance of 2 Railroad St. for 23 days, 47 Exchange St. for 26 days, and 96 Boston St. for 34 days.
[22] In the Supplemental Affidavit, Noonan avers that the police did not begin to "use" the camera at 2 Railroad St. until June 5, a day after the police installed it on June 4. However, the date of installation, not the date of first use by police, is the date that is relevant to the Court's consideration of whether the defendants have a reasonable expectation of privacy in the surveillance. See Commonwealth v. Estabrook, 472 Mass. 852, 858 - 859 (2015) ("It is important to emphasize that, in terms of reasonable expectation of privacy, the salient consideration is the length of time for which a person's CSLI is requested, not the time covered by the person's CSLI that the Commonwealth ultimately seeks to use as evidence at trial.") (citation omitted) (emphasis added).
[23] Santiago Ortiz submitted an affidavit in which he averred that he lived at 96 Boston St. and he did not expect the police would conduct surveillance of him going into and out of his home over an extended period of time. (Paper No. 25 in No. 1977CR00469). Although Cruz-Gonzalez has not yet filed such an affidavit, his counsel represented at the hearing that he would file an affidavit averring that he lived at 47 Exchange St. and 2 Railroad St. and that he did not expect police would conduct surveillance for the period involved. Cruz-Gonzalez shall file an appropriate affidavit within 21 days hereof. The Court will reconsider its decision herein if he fails to do so or if the Commonwealth believes the affidavit is insufficient.
                                                            Page 16 of 24
            The Court must next determine whether the defendants have met their burden to prove their subjective expectations of privacy in their comings and goings from their residences over a period of 23 days is one that "'society is willing to recognize . . . as reasonable.'" Id. at 368 (citation omitted). In order to do so, the Court will begin its analysis with a case referenced by the SJC in Mora.
            In Commonwealth v. Rousseau, 465 Mass. 372 (2013), the defendants' "convictions arose out of their participation in a series of criminal acts involving the burning and vandalizing of four different properties during the summer of 2007." Id. at 373 — 374. "On appeal, both defendants argue[d] that a warrant secured by the State police for the purpose of attaching a global positioning system (GPS) device to [the vehicle of one of the defendants], and then tracking its location over a thirty-one-day period, was not supported by probable cause and was overly broad, and therefore violated the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights." Id. at 374. Thus, the SJC was asked to decide, "whether . . . the government's contemporaneous electronic monitoring of one's comings and goings in public places invades one's reasonable expectation of privacy." Id. at 382. The SJC "conclude[d] that under art. 14, a person may reasonably expect not to be subjected to extended GPS electronic surveillance by the government, targeted at his movements, without judicial oversight and a showing of probable cause," and "the fact that police monitored Rousseau [a passenger without a possessory interest in the vehicle] over a thirty-one-day period is sufficient to establish that he ha[d] standing to challenge the validity of the warrant." Id. (citations omitted).
                                                            Page 17 of 24
            In Mora, the Commonwealth argued that, unlike the GPS technology in Rousseau and the CSLI at issue in a line of cases, including Commonwealth v.  Augustine, 467 Mass. 230 (2014), pole camera evidence "does not provide the same detailed picture of a person's movements in public." Mora, 485 Mass. at 372. In rejecting that argument, the SJC stated that "'even where an individual's conduct is observable by the public, the individual still may possess a reasonable expectation of privacy against the use of electronic surveillance that monitors and records such conduct for a continuous and extended duration." Id. (citation omitted). Further, citing Rousseau, the SJC explained, "[lather than focus solely on whether a surveillance technology tracks a person's public movements, our analysis under art. 14 turns on whether the surveillance was so targeted and extensive that the data it generated, in the aggregate, exposed otherwise unknowable details of a person's life." Id. at 373.
            The SJC in Mora went on to explain that prolonged video surveillance of a home is more invasive than the GPS monitoring of a vehicle at issue in Rousseau:
Indeed, compared to the GPS vehicle tracking in Rousseau, prolonged and targeted video surveillance of a home has the potential to generate far more data regarding a person's private life. Rather than a dot on a map, video surveillance reveals how a person looks and behaves, with whom the residents of the home meet, and how they interact with others. Pole camera surveillance of the home captures these revealing interactions at the threshold of a person's private and public life. The longer the surveillance goes on, the more the boundary between that which is kept private, and that which is exposed to the public, is eroded.
Id.
            Therefore, given the SJC's holding in Rousseau and its observation in Mora that video surveillance of a home is more intrusive than the GPS monitoring in Rousseau, this Court concludes that, if presented with the issue, the SJC would hold that
                                                            Page 18 of 24
continuous video surveillance of a home for at least 31 days would constitute a search under Article 14. Consequently, the Court rules that the continuous video surveillance by the police of 96 Boston St. for 34 days is a search under Article 14.
            Here, the question remains whether the SJC would rule that a search under Article 14 occurred if presented with the continuous video monitoring of 2 Railroad St. for 23 days. This Court believes the SJC would so rule for three reasons. First, the SJC and the United States Supreme Court have repeatedly observed that "when it comes to the Fourth Amendment [and Article 14], the home is first among equals." Florida v.  Jardines, 569 U.S. 1, 6 (2013) (citation omitted); see Commonwealth v. Alexis, 481 Mass. 91, 96 (2018) ("Historically, the Massachusetts Constitution has carefully protected the home from the intrusion by the government without a warrant, with certain delineated exceptions.") (citations omitted).
            Second, the Court's ruling is supported by the reasoning of our appellate courts that have ruled that a defendant has a reasonable expectation of privacy in CSLI data for periods far less in duration than the 23 days of video surveillance at issue here. See Augustine, 467 Mass. at 232, 235 (ruling defendant has a reasonable expectation of privacy in historical CSLI data covering a two week period); Commonwealth v. Tewolde, 88 Mass. App. Ct. 423, 436 — 438 (2015) (ruling that CSLI and cell tower data covering a period of 5 days "intruded into the defendants' reasonable expectations of privacy and violate art. 14 if they do not comply with the warrant requirement."); see also Carpenter v. United States, 138 S. Ct. 2206, 2217 n.3 (2018) (ruling it "need not decide whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny, and if so, how long that period might be. It
                                                            Page 19 of 24
is sufficient for our purposes today to hold that accessing seven days of CSLI constitutes a Fourth Amendment search."). To be sure, the SJC recently observed that "[c]ollecting more than six hours of CSLI data invades a defendant's reasonable expectation of privacy, and, therefore, under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, requires a warrant supported by a showing of probable cause." Commonwealth v. Wilkerson, 486 Mass. 159, 165 —166 (2020) (citations omitted).[24]
            Third, the case of United States v. Anderson-Baqshaw, 509 Fed. Appx. 396 (6th Cir. 2012), which the SJC cited in Mora, supports this Court's conclusion that the SJC would rule the continuous video surveillance of a home for 23 days is a search under Article 14. There, the defendant challenged the government's use of a pole camera that collected footage of the defendant's backyard for a period of 24 days. Id. at 401. The Sixth Circuit agreed with the defendant that the backyard area at issue was part of the curtilage of the defendant's home. Id. at 404. But, "[s]ince the 'backyard' was visible from a publicly accessible location, the government agents were constitutionally permitted [under the Fourth Amendment] to view whatever portions of it were visible from this point." Id. at 405.
            However, the Sixth Circuit in Anderson-Baqshaw further observed:
Nonetheless, we confess some misgivings about a rule that would allow the government to conduct long-term video surveillance of a person's backyard without a warrant. Few people, it seems, would expect that the government can constantly film their backyard for over three weeks using a secret camera that can pan and zoom and
---------------------------
[24] Moreover, in another case the SJC recently reiterated that,"[b]ecause the government can aggregate long periods of CSLI to create a 'complete mosaic' of a person's life, people must have a reasonable expectation of privacy in that mosaic even if they do not have a reasonable expectation of privacy in each individual movement collected by the CSLI." Commonwealth v.  Gosselin, 2020 Mass. LEXIS 729, *12-13 (November 19, 2020) (citation omitted).
                                                            Page 20 of 24
stream a live image to government agents. We are inclined to agree with the Fifth Circuit that "[t]his type of surveillance provokes an immediate negative visceral reaction."
            . . .
Ultimately, since we hold that any possible Fourth Amendment violation here would be harmless, we decline to decide whether longterm video surveillance of curtilage requires a warrant.
Id. (citation omitted).
            In sum, the Court rules that the defendants met their burden to establish that the police conducted searches under Article 14 when they continuously surveilled the three residences at issue here using pole and car cameras.
C. ALTHOUGH THE POLE AND CAR CAMERA SURVEILLANCE IN THIS CASE WERE SEARCHES UNDER ARTICLE 14, THE COMMONWEALTH MET ITS BURDEN UNDER MORA TO ESTABLISH  PROBABLE CAUSE TO JUSTIFY THE SURVEILLANCE
            Now that the Court has ruled that searches under Article 14 occurred here, the burden shifts to the Commonwealth under the Mora two-prong standard to show that, at the time the police first installed the cameras at each of the three locations, the police had probable cause to believe: (1) that drug distribution crimes had been committed; and, (2) that the camera footage would produce evidence of such a crime or would aid in the apprehension of a person who the police had probable cause to believe committed the crime. Mora, 485 Mass. at 377.
            There is no reasonable dispute that, as of May 24, 2019, at 2:20 p.m. when the officers deployed the first camera at issue here (i.e., a car camera on Boston Street), police had ample probable cause to believe that Adames Abreu, Santana, Galan, and Acevedo-Hernandez committed and were committing drug trafficking offenses. Further, by that time, officers had probable cause to believe that Cruz-Gonzalez, Santiago Ortiz,
                                                            Page 21 of 24
and numerous others were engaged in an ongoing conspiracy to violate the Controlled Substances Act in violation of G.L. c. 94C, § 40.[25]
            Moreover, as of May 24, 2019, at 2:20 p.m., the police had probable cause to believe that camera footage of 96 Boston St. would produce evidence of the conspiracy and would aid in the apprehension of Cruz-Gonzalez. By that time, the police had probable cause to believe that Cruz-Gonzalez was a high-ranking member of the DTO, that he lived at 96 Boston St., and that his comings and goings from the location would produce evidence of the conspiracy and would assist them in arresting him.
            The police developed additional evidence of the drug trafficking conspiracy (and the participation of Cruz-Gonzalez and Santiago Ortiz in it) before June 1, 2019, at 12:40 p.m., when police first deployed a (car) camera in the area of 47 Exchange Street. By that time, they reasonably believed that Cruz-Gonzalez also stayed overnight at the location, and that his comings and goings would produce evidence of the conspiracy and would assist police in arresting him. Further, by the time police first deployed a pole camera at 2 Railroad St. on June 4, 2019, at 12:01 a.m., the police had ample evidence that Cruz-Gonzalez and Santiago Ortiz used that location to conduct DTO-related business, and that their comings and goings would produce evidence of the conspiracy and would assist police in arresting them.
            Based on this, the Court rules that the Commonwealth has met its burden to establish the two prongs of the Mora standard for each of the three instances of continuous video surveillance at issue here and that the police did "not act[] in a wholly
---------------------------
[25] "To sustain a conviction for conspiring to distribute [narcotics], the prosecution must [ ] introduce[] evidence tending to show that [the defendant] made an agreement with another person to distribute [narcotics]." Commonwealth v. Stoico, 45 Mass. App. Ct. 559, 562 (1998) (citations omitted).
                                                            Page 22 of 24
arbitrary manner" when they conducted the continuous video surveillance in this case. Mora, 485 Mass. at 377. Nevertheless, the Court will briefly address an argument advanced by the defendants at the hearing regarding the second prong of the Mora standard.
            The defendants argue the Commonwealth must show under the second prong of the Mora standard that the drug trafficking and conspiracy crimes were, or were about to be, committed at the residence sought to be surveilled. They argue that, like when analyzing the sufficiency of evidence used to obtain a warrant for the search of the interior of a home, the Commonwealth must show a nexus between the criminal conduct at issue and the location the police seek to surveil.
            The defendants' argument fails for two reasons. First, the SJC adopted the standard in Mora from Augustine, which, as stated, addressed a search of CSLI. In Augustine, the SJC adopted the standard from Commonwealth v. Connolly, 454 Mass. 808 (2009), which addressed the standard for issuing a warrant for GPS monitoring of a motor vehicle. See id. at 825 ("The Commonwealth must establish, before a magistrate, probable cause to believe that a particularly described offense has been, is being, or is about to be committed, and that GPS monitoring of the vehicle will produce evidence of such offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit such offense."). Furthermore, it is worth noting that in Connolly, the SJC limited the monitoring period to "no longer than fifteen days from the date of the warrant's issuance." Id. (citation omitted). In both Augustine and Connolly, the crimes at issue were obviously not ones that occurred in the place to be searched/surveilled.
                                                            Page 23 of 24
            Second, the defendants misunderstand the standard necessary to secure a search warrant for a home. "To establish probable cause to search, the facts contained in the warrant affidavit, and the reasonable inferences to be drawn therefrom, must be sufficient for the issuing judge to conclude that 'a crime had been committed ... and that items described in the warrant were related to the criminal activity and probably in the place to be searched.' Commonwealth v. Morin, 478 Mass. 415, 425 (2017) (citation omitted in original) (quoting Commonwealth v. O'Dav, 440 Mass. 296, 298 (2003)) (emphasis added). Thus, there is no legal requirement that the crime under investigation was committed at the place to be searched. To be sure, courts routinely authorize search warrants to search residences other than the location at which the alleged crime was committed on grounds that there is probable cause to believe that a crime has been committed somewhere, and that evidence related to that crime is likely to be found in the place to be searched.
            For the above reasons, the RCG Motion and the ISO Motion are DENIED.
ORDER
            For the above reasons, it is HEREBY ORDERED that:
            1. Ramon Cruz-Gonzalez's Supplemental Memorandum Of Law In Response To The Court's Procedural Order No. 1 (Paper No. 13 in No. 1977CR00467) is DENIED. Within 21 days hereof, Ramon Cruz-Gonzalez shall file an affidavit in accord with footnote 23 herein and the Court will reconsider the grounds for said denial if he fails to do so or if the Commonwealth believes the affidavit is insufficient.
            2. Israel Santiago Ortiz's Motion To Reconsider Denial Of Defendant's Motion To Suppress After Commonwealth v. Mora (Paper No. 22 in 1977CR00469) is DENIED.
@/s/Jeffrey T. Karp Associate Justice, Superior Court
@November 30, 2020
                                                            Page 24 of 24
xxz